1  John D. Klinedinst, Bar No. 86254
   Gregor A. Hensrude, Bar No. 226660
2  KLINEDINST PC
   501 West Broadway, Suite 600
3  San Diego, California 92101
   (619) 239-8131/FAX (619) 238-8707
4  ghensrude@klinedinstlaw.com

5  Attorneys for Defendant
   TOM COVERSTONE
6

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10 HOYT A. FLEMING,                  | Case No.   08 CV 355WQHNLS
11       Plaintiff,                  | DECLARATION OF TOM COVERSTONE
                                     | IN SUPPORT OF SPECIAL MOTION TO
12    v.                             | STRIKE
13 TOM COVERSTONE,                   | Date:
                                     | Time:
14       Defendant.                  | Courtroom:
                                     | Judge:
15                                   | Magistrate Judge:
                                     | Complaint Filed:
16                                   | Trial Date:    None set

17

18    I, Tom Coverstone, declare as follows:

19    1.    I am the named defendant in the above-captioned matter. I am also an

20 officer of GMT Management Co., a Texas entity for which I was acting at all times

21 described below.

22    2.    I have personal knowledge of the following facts, and if called upon as a

23 witness, I could and would completely and competently testify thereto.

24    3.    I became aware of an issued patent and two pending applications ("patent")

25 related to radar detectors and car guidance systems owned by Plaintiff Hoyt Fleming in

26 October, 2007, when I was told about the patent by my attorney, Michael Dowler, who

27 was apparently a friend of Mr. Fleming's. Subsequent to that, and up and until the time

28 of filing of this action, we had several communications about the patent and, in particular,

- 1 -
DECLARATION OF TOM COVERSTONE IN SUPPORT OF SPECIAL MOTION TO STRIKE
08 CV 355WQHNLS

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

the possibility of my company purchasing his patent. In January 2008, Mr. Fleming and I exchanged some e-mails evidencing our intention to put a transaction together wherein my company would purchase his patent for $1 million if it checked out after a due diligence period. At that time, it was contemplated that I would pay $900,000 to Mr. Fleming and $100,000 to a church of his choosing, Vineyard Boise. It was my further understanding at that time that Mr. Fleming intended to use the money I paid to Vineyard Boise as some sort of tax deduction.

4. During all of the relevant negotiations in question, I was not negotiating on behalf of myself. I do not and have never purchased patents as an individual; my company purchases them and conducts business regarding them. When I am involved in patent negotiations, I am always doing so on behalf of a company. At the time of this negotiation, I contemplated purchasing the patent on behalf of GMT Management Co., a Texas company of which I am an officer.

5. Mr. Fleming wrote in an e-mail dated January 22, 2008, a brief summary of the terms as we had negotiated them so far. A true and correct copy of this e-mail with the terms is lodged herewith as Exhibit "A." I responded to that e-mail agreeing to those terms but setting forth an additional term: that his wife must sign off as well. A true and correct copy of my e-mail is lodged herewith as Exhibit "B." I understood at the time that he owned the patents as an individual, and it was therefore very likely that they were owned as community property. I did not want there to be a later argument that I did not wholly own the patent. Because minority patent owners can independently license patents, this was a very significant issue to my company. I do not recall Mr. Fleming ever consenting to that term, and cannot find any document demonstrating his assent.

6. At the time I sent Exhibit "B," I did not intend to formulate a binding contract. In fact, I was traveling that day and simply typed a few words into my Blackberry as part of the continuing discussions. Clearly we could not have finalized anything that day because we had not yet established some of the key terms (for example, the Vineyard Boise issue had not been resolved, he had not yet told me whether his wife

was willing to sign, and he said that we would do the transaction on behalf of my entity, but had not yet asked the entity name). Moreover, I would never purchase a patent without an opportunity to conduct full due diligence to see if it was really as valuable as had been represented to me. My company also would not do so until our lawyers reviewed the agreement and drafted the necessary provisions. It was my intention to put down earnest money to allow me an exclusive due diligence period, such that Mr. Fleming would not be selling the patent to others during that time. In my experience that is the way such transactions are often, even ordinarily, handled. It is my understanding that Mr. Fleming had the same intent, as evidenced by his subsequent e-mails to me.

7. After this exchange of e-mails, I began doing due diligence in some detail. During that due diligence, I discovered that the patent was not worth nearly what Mr. Fleming had represented to me, and that in fact several of his specific contentions (namely a contention that the patent had stopped a Uniden patent from proceeding and that an Escort patent could not get around his patent portfolio) were actually inaccurate. In discussions regarding the former, he continued to assert that his patent had in fact held up another, as can be seen from an e-mail string between us marked as Exhibit "C." In fact, he later conceded that his representation regarding Uniden was inaccurate in a subsequent e-mail, a true and correct copy of which is lodged herewith as Exhibit "D."

8. At some point during the transaction, it became clear that there were some significant tax ramifications from the assignment and sale to Vineyard Boise. Mr. Fleming then stated that under the modified contract, in order to obtain a tax benefit, Vineyard Boise would have no obligation to assign the patent to me when I made the payment. This was wholly unacceptable, because it left my company with the possibility of owning only a part of a patent. Mr. Fleming also offered to remove Vineyard Boise from the transaction entirely, provided that I pay him an extra $25,000 in order to offset his intended tax benefit. That was not acceptable to my company either.

9. As a consequence of this ongoing issue and my due diligence, I determined

- 3 -
DECLARATION OF TOM COVERSTONE IN SUPPORT OF SPECIAL MOTION TO STRIKE
08 CV 355WQHNLS

that GMT was not willing to go through with the transaction or complete the remaining documents. I so informed Mr. Fleming. I also offered an alternate purchase arrangement involving less money up front and providing him a share of any money made through use of the patent in the future.

10. He responded by stating that I had to go through with the transaction and that he was going to keep my money in the event that I did not. We then exchanged a number of e-mails back and forth in an attempt to negotiate a resolution of this issue, without requiring him or GMT to file a lawsuit. A true and correct of those e-mails discussing settlement are lodged herewith as Exhibits "E," "F," "G," "H," and "I." At the time I was sending and receiving these e-mails, I was well aware of the fact that if we were not able to resolve this issue, the next step in the immediate future would have been litigation. As can be seen from the face of the e-mails, they were all within a few days of one another. At that time, I was prepared to file a lawsuit on behalf of GMT (as I indicated in my correspondence) in the event we were not able to reach a satisfactory resolution. We did reach a resolution, wherein Mr. Fleming agreed to return my deposit and execute mutual releases, but he then decided against compromising. As it turned out, Mr. Fleming filed a lawsuit before I did, which obviated my need to initiate a new lawsuit (as opposed to simply filing as a cross-complaint in this case).

11. As indicated in my e-mails, I was in discussions with my litigation attorneys at this time. Because I do not wish to waive the privilege, I will not disclose any of the substance of those communications. I was also in communication with two other attorneys that represent me on transactional matters and patent litigation matters. The only other persons with whom I spoke about these patents were a few third parties with whom I spoke in performing due diligence. Not surprisingly, I did not make any negative statements about Mr. Fleming or his patents to any of those third parties. Other than discussions as set forth herein, I have not had any discussions with any individuals regarding Mr. Fleming, the misrepresentations I believe he engaged in, or this patent transaction. Again, excluding anything I may or may not have said to my or GMT's

attorneys, I never spoke to any third party regarding Fleming's character, truthfulness or veracity.

12. The statements that I made in the e-mails between myself and Mr. Fleming, and any verbal statements I made, I believe were true and accurate at all times. I believe Mr. Fleming *did* engage in a breach of fiduciary duty by simultaneously representing me and failing to disclose certain relevant facts with respect to the patent. I had, and still have, significant concerns that we entered into an attorney-client relationship out of his Idaho office, when I now know that he was not licensed to practice in Idaho. I also believe that he made misrepresentations to me about the value of the patent and specifically about the potential benefits to the patent. For example, his statements about his portfolio's impact on the Uniden patents, which were of significance to me, were inaccurate. I believed, and still believe, that I was entitled to return of my deposit on account of the fact that I had relied upon his misrepresentations to put down my deposit in the first instance.

13. Fleming has not, to this day, returned my deposit or paid me any other money or compensation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed the 16th day of June, 2008.

_____
Tom Coverstone

637786v2