STEVEN F. SCHOSSBERGER
California Bar Number 178494
HAWLEY TROXELL ENNIS & HAWLEY, LLP
877 W. Main Street, Suite 1000
Boise, ID 83702
(208) 344-6000
(208) 342-3529 (facsimile)

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOYT A. FLEMING,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>TOM COVERSTONE,<br><br>　　　　Defendant | Case No.: 3:08-cv-00355 WQH-NLS<br><br>SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT; EXTORTION; AND DEFAMATION<br><br>DEMAND FOR JURY TRIAL |

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Hoyt A. Fleming ("Fleming") is an individual and a resident of the State of Idaho.

2. Defendant Tom Coverstone is an individual and a resident of the State of California.

3. This court has jurisdiction over this matter and over the person of Defendant pursuant to 28 U.S.C. Section 1332.

4. Venue is proper in this federal district.

## FACTUAL BACKGROUND

5. Fleming is an attorney that is registered to practice before the United States Patent and Trademark Office

**EXHIBIT A**

6. Defendant has a place of business at 6241 Mimulus, Rancho Santa Fe, CA 92067.

7. Defendant has a place of business at 3525A Del Mar Heights Road #334, San Diego, CA 92130.

8. Defendant is an attorney that is registered to practice before the United States Patent and Trademark Office.

9. On January 22, 2008, Fleming agreed to sell and Defendant agreed to purchase U.S. Patent No. 6,204,798, which has been reissued, Reissue Patent No. 039,038, Patent Application No. 11/196,841, and Patent Application No. 11/924,352.

10. On January 22, 2008, Fleming sent Defendant an email that stated in part:

"Tom,

This email confirms that I have agreed to sell and that you have agreed to purchase U.S. Patent No. 6,204,798, which has been reissued, Reissue Patent No. 039,038, Patent Application No. U.S. Patent No. 11/196,841, and Patent Application No. 11/924,352. The purchase price for the above patents and applications is one million dollars.

You and I will strive to close the sale by February 1, 2008. However, you and I will close the sale by February 15, 2008.

Both you and I understand that I will assign a 10% interest in the above patents and applications to Vineyard Boise, a church in Boise, Idaho, and that Vineyard Boise will then assign its 10% interest to you, or an entity that you designate. I will assign my 90% interest directly to you or an entity that you designate. You will then immediately pay me $900,000 and you will then immediately pay Vineyard Boise $100,000.

You and I agree that you and/or your attorneys will draft the necessary

agreements

You agree to wire me ten thousand dollars tomorrow as a deposit on the purchase price. This deposit will not be refunded if the above sale is not completed by February 15, 2008. I agree to work with you and your attorneys to close the sale by February 15, 2008.

If you desire my assistance on matters relating to the above patents and/or applications, you may retain me through my firm, Park, Vaughan, and Fleming. My hourly rate is $425 for non-testifying services, and $850 for testifying services.

If you agree to the above, then please confirm via email.

Thank you.

Hoyt Fleming"

11. On January 22, 2008, Defendant sent Fleming an email that contained the text of the email of paragraph 10, and stated in part:

"Hoyt,

Agreed.

I will wire the $10,000.00 tomorrow to your account.

As we discussed on the phone just now, your wife Teresa will sign the assignment documents or whatever is needed. I am tied up this week, let's talk next Monday morning.

Best Regards,

Tom"

12. The January 22, 2008 e-mail exchange constitutes a binding and enforceable contract in that it expresses an immediate intent by the parties to be bound by the terms of the Contract which include an offer, acceptance and consideration. The January 22, 2008 contract is not merely an agreement to agree.

13. On January 23, 2008, Defendant wired $10,000 from a bank account entitled "THOMAS E COVERSTONE SOLE AND SEPARATE PROPERTY" to Fleming's bank account.

14. The January 22, 2008 email Defendant sent to Fleming constitutes a binding and enforceable contract that has exactly two parties, Fleming and Defendant.

15. On or before January 22, 2008, Fleming had no knowledge of GMT Management Co.

16. On or before January 22, 2008, Defendant did not communicate to Fleming any information regarding GMT Management Co.

17. On or before January 22, 2008, Defendant did not communicate to Fleming that Defendant was negotiating on behalf of GMT Management Co.

18. In all negotiations occurring on or before January 22, 2008, Defendant was negotiating and entered into the January 22, 2008 contract as an individual.

19. On February 15, 2008, Defendant sent Fleming an email that stated in part:

"Hoyt,

You committed fraud and conspired to do the same. You mischaracterized your patents, the prior art and the file histories. You also did not disclose material facts relating to same. You did all of this even despite the attorney engagement you requested and entered with me, apparently on behalf of your entire firm. These are very serious ethics violations.

Please send my $10,000 to the address below by February 20th.

If you agree to return the $10,000, I will agree to release and waive my potential claims against you and your law firm provided it is a mutual waiver, with you likewise releasing and waiving any potential claims. Otherwise, I will be forced to consider my other options.

Finally, do not communicate with Howrey on this. If we cannot resolve this issue now, then I will have you communicate with my litigation attorneys.

Tom"

20. On February 15, 2008, Fleming sent Defendant an email that stated in part:

"Each and every ethics violation you made is completely baseless

Your position is you would like me to return your deposit even though you agreed that the deposit would not be refunded. My position is that you owe me specific performance. Recall, that you agreed "to purchase U.S. Patent No. 6,204,798 . .""

21. On February 15, 2008, Defendant sent Fleming an email that stated in part:

"Per my previous emails where I outlined in detail why there was not an agreement between us, you continue to try to hold that there was an agreement. There was not an agreement, there never was. We did not agree on key material terms. In fact, key material terms were being renegotiated just recently and over many weeks. As an example, and in one alternative potential agreement, you offered to change the assignment allocation regarding the church and I then pay you $25,000 more than the earlier price you wanted because you had doubts in your illegal tax deduction scheme with Boise Vineyard. In addition, when I told you that your tax scheme was illegal, you responded by citing a tax reference that showed that the Vineyard would not have an obligation to assign their interest in the patent to me. That seems important since even a small owner of a patent can license infringers. When parties are renegotiating key material terms - does that sound like the key material terms were set in an agreement? You can keep pasting a fragment of a sentence in an email and sending it to me, but I have not heard any substance from you at all. In fact, I all hear is lies and

misrepresentations. I will not even address the fact that you prepared the email that you keep pasting from and you coerced me into agreeing to your email while I was on an airplane and the flight attendant was telling me to get off of the phone. You could not wait because you had so many buyers for the patents knocking on your door. Was that a lie too?

In addition, you committed fraud – even if there was an agreement – which there was not – it would have been based on fraud in the inducement. You materially misrepresented key facts relating to your patents and competing patents. You deny ethics violations in your email, but you do not deny the misrepresentations you made.

Having said all of this – I am willing to let this be dropped. I want my 10k back. And if you send the 10k back – and the return of the money is based on a matter of principle – I am willing to sign a mutual release.

Think about resolving this issue over the weekend. Nevertheless, I will need to hear back from you on Monday so that I can plan my course.

Tom"

22. On February 15, 2008, Defendant sent Fleming an email that stated in part:

"You breached your fiduciary responsibility that you owed me; you breached your duty of loyalty you owed to me; you breached your duty to represent me zealously. And all of this was in the guise of you being so committed to your church. And that, amongst other things, ironically was one reason why we never reached an agreement. Because of your illegal tax scam with your church – we were negotiating the assignment issue in every conversation that we had – let me repeat that: in every conversation that we had we were negotiating the assignment issue regarding the church. You were adverse to me while

you were representing me!! A key term was not defined!!! In time, the negotiation matured into different financial terms with differences of tens of thousands of dollars. Are you denying this? Are you denying that your position regarding the church assignment was that the church had no obligation whatsoever to assign their interest in the patent to me? Are you denying that? Are you going to just cut and paste a fragment of the sentence of the email that you sent to me while I was traveling? Are you denying that you badgered me while I was on an airplane to agree to your alleged agreement? – that you had other buyers that just had to know that day – that hour – that quarter of an hour?!! Any contract – not that there was one - would be void and null anyway since one of the material key elements of your proposal included the illegal tax scam with the church. What is your legal position? Are you a lawyer? Are you going to just cut and paste a fragment of a sentence in response? This issue is becoming a matter of principle for me. I am getting to a point where this (and you) need to be dragged into the light. You do not deserve to be practicing law nor do you deserve to be in the patent fraternity. Truth and good will prevail - You can take that to your church –

I am giving you until Monday – and that is a generous offer on my part "

23. On and after February 15, 2008, Defendant attempted to blackmail Fleming by threatening to publicly accuse Fleming of numerous "serious ethics violations" and criminal conduct unless Fleming paid Defendant $10,000.

24. Defendant's threat to publicly accuse Fleming of an "illegal tax scam" is not a valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances and is therefore not protected by California's anti-SLAPP statute.

25. Defendant's threat to publicly accuse Fleming of a purported "illegal tax scam" is illegal as a matter of law and is therefore not protected by California's anti-SLAPP statute.

26. Defendant's threat to publicly accuse Fleming of a purported "illegal tax scam" has absolutely no connection or logical relation to the contract dispute that existed between Fleming and Coverstone on February 15, 2008 and is therefore not protected by the litigation privilege of Cal. Civil Code section 47 subd. (b).

27. Federal Rule of Evidence 408 does not bar Fleming's evidentiary use of Defendant's blackmail threats, as alleged above in paragraphs 19, 21 and 22 in this action. The February 15, 2008 e-mail exchange does not constitute an offer by Defendant to compromise the disputed contract claim, but gives rise to the wholly and new independent legal cause of action of extortion.

28. Defendant's blackmail threats were made with malice in fact.

29. On and after February 15, 2008, the date on which Defendant's performance was to have been fully completed, Defendant continued to refuse, despite demand, to tender the agreed-upon purchase price and otherwise fully perform his contractual obligations under the January 22, 2008 contract.

30. Although Fleming was being blackmailed by Defendant, Fleming did not pay Defendant the demanded $10,000.

31. On April 7, 2008, Fleming learned that Defendant was making good on Defendant's blackmail threats.

32. On April 7, 2008, Fleming received a phone call from Mr. Jonathan Fox, a reporter for the Texas Lawyer, a legal interest newspaper.

33. On April 7, 2008, Mr. Jonathan Fox faxed Fleming a copy of a Petition filed in the case *Guardian Media Technologies, Ltd, and GMT Management Company. v. Howrey L.L.P. and Michael S. Dowler,* Case No. 2008-20263 ("the Texas Complaint").

34. On April 7, 2008, Mr. Jonathan Fox communicated to Fleming that he was "tipped off" about the *Guardian Media Technologies, LTD, and GMT Management Co. v. Howrey L.L.P. and Michael S. Dowler* lawsuit.

35. The Texas Complaint contains evidence that it was faxed from the Defendant's agent, The Smoot Law Firm, P.C., to the Texas Lawyer.

36. Upon information and belief, The Smoot Law Firm, P.C. faxed the Texas Complaint to the Texas Lawyer at Defendant's direction.

37. The Texas Complaint contains at least the following false, defamatory, unprivileged statements that have a natural tendency to injure or cause special damage to Fleming:

"Both Dowler and Fleming further puffed up the value of the patent."

"Based on the representations of Dowler and Fleming as to the remarkable value of the patent, and the analysis Dowler had allegedly committed to investigating the patent, Coverstone expressed his interest in Guardian possibly buying the patent for the $1,000,000.00 asking price, subject to Coverstone's review of the due diligence materials."

"Again based on the representations of Dowler and Fleming as to the remarkable value of the patent Coverstone continued to express his interest in Guardian potentially buying the patent."

"Both Fleming and Dowler pressured Coverstone to commit to purchase the

patent. While in the course of traveling and at the insistence and urging of Dowler and Fleming, Coverstone was convinced to rush a $10,000 wire transfer to Fleming as earnest money on behalf of Guardian."

"Coverstone on behalf of Guardian thereafter made his own inquiry as to the validity and value of the patent, unfortunately learning that the patent did not in fact, contrary to what had been represented by Dowler and Fleming, provide protection from the potential commercial competitors in the marketplace for the product envisioned by the patent and actually had little to no value. Coverstone learned that the principal makers of radar detectors were familiar with and not concerned about infringing the patent that Dowler had so highly touted. Contrary to the representations of Dowler and Fleming, Coverstone discovered that the principal makers of radar detectors were able to market, and were already marketing, GPS enabled radar detectors without fear of illegally infringing the patent that Dowler had been fawning over."

"After learning that Dowler and Fleming had misrepresented the value of the patent, Coverstone told Fleming that he had discovered the misrepresentations and the true value of the patent, and that the sale would therefore not go through."

38. The statements included in the Texas Complaint were published by Defendant's agent to a newspaper and are therefore not protected by the litigation privilege of Cal. Civil Code section 47 subd. (b).

39. On or about April 21, 2008, www.law.com, a legal interest website, published an article entitled "Former Clients Sue Howrey After Alleged Patent Deal Sours", written by Jonathan Fox, and published a copy of the Texas Complaint.

40. The copy of the Texas Complaint, which was published on www.law.com, contains at least the following false, defamatory, unprivileged statements that have a natural tendency to injure or cause special damage to Fleming:

"Both Dowler and Fleming further puffed up the value of the patent."

"Based on the representations of Dowler and Fleming as to the remarkable value of the patent, and the analysis Dowler had allegedly committed to investigating the patent, Coverstone expressed his interest in Guardian possibly buying the patent for the $1,000,000.00 asking price, subject to Coverstone's review of the due diligence materials."

"Again based on the representations of Dowler and Fleming as to the remarkable value of the patent Coverstone continued to express his interest in Guardian potentially buying the patent."

"Both Fleming and Dowler pressured Coverstone to commit to purchase the patent. While in the course of traveling and at the insistence and urging of Dowler and Fleming, Coverstone was convinced to rush a $10,000 wire transfer to Fleming as earnest money on behalf of Guardian."

"Coverstone on behalf of Guardian thereafter made his own inquiry as to the validity and value of the patent, unfortunately learning that the patent did not in fact, contrary to what had been represented by Dowler and Fleming, provide protection from the potential commercial competitors in the marketplace for the product envisioned by the patent and actually had little to no value. Coverstone learned that the principal makers of radar detectors were familiar with and not concerned about infringing the patent that Dowler had so highly touted. Contrary

to the representations of Dowler and Fleming, Coverstone discovered that the principal makers of radar detectors were able to market, and were already marketing, GPS enabled radar detectors without fear of illegally infringing the patent that Dowler had been fawning over."

"After learning that Dowler and Fleming had misrepresented the value of the patent, Coverstone told Fleming that he had discovered the misrepresentations and the true value of the patent, and that the sale would therefore not go through."

41. The article entitled "Former Clients Sue Howrey After Alleged Patent Deal Sours", written by Jonathan Fox, which was published on www.law.com, contains at least the following false, defamatory, unprivileged statements that have a natural tendency to injure or cause special damage to Fleming:

"Coverstone, the plaintiffs allege, then investigated the patent, "unfortunately learning that the patent did not in fact, contrary to what had been represented by Dowler and Fleming, provide protection from the potential commercial competitors in the market place for the product envisioned by the patent and actually had little to no value.""

"Coverstone discovered that the principal makers of radar detectors already were marketing GPS-enabled radar detectors and were "not concerned about infringing the patent that Dowler had so highly touted.""

42. The statements included in the copy of the Texas Complaint and the statements included in the article entitled "Former Clients Sue Howrey After Alleged Patent Deal Sours" were published by www.law.com, are therefore not protected by the litigation privilege of Cal. Civil Code section 47 subd. (b).

43. Defendant's publication of the Texas Complaint, via Defendant's agent, which induced and directly resulted in the publication of the copy of the Texas Complaint on www.law.com and the publication of the article entitled "Former Clients Sue Howrey After Alleged Patent Deal Sours" on www.law.com, was made with malice in fact.

44. Upon information and belief, Defendant, and/or Defendant's counsel at Defendant's direction, made defamatory statements to Jonathan Fox and/or other third parties similar to those contained in the Texas Complaint.

## COUNT ONE—BREACH OF CONTRACT

45. Fleming restates and re-avers the preceding paragraphs 1 through 44 of this Complaint in and to paragraph 45 of this Count One.

46. By refusing and continuing to refuse his contractual obligations, Defendant has breached the January 22, 2008 contract.

47. Fleming, despite efforts to mitigate his damages, has not yet been able to secure a substitute and successor buyer for the patent family and thus has been deprived of the benefit of his contract with Defendant.

48. As a direct and proximate result of Defendant's breach, Fleming has been damaged in an amount in excess of $75,000 and in an exact amount to be determined at trial

## COUNT TWO--DEFAMATION

49. Fleming restates and re-avers the preceding paragraphs 1 through 44 of this Complaint in and to paragraph 49 of this Count Two.

50. Defendant's conduct complained of above constitutes defamation *per se* and has subjected Fleming to obloquy and scorn and has caused Fleming to suffer embarrassment and emotional distress.

51. As a direct and proximate result of Defendant's defamation, Fleming has been damaged in an amount in excess of $75,000 and in an exact amount to be determined at trial.

52. As Defendant's defamatory conduct (1) was made with an affirmative intent to injure Fleming and (2) was made with malice in fact, Fleming seeks exemplary damages based upon Defendant's despicable conduct.

## COUNT THREE—CIVIL EXTORTION

### Cal. Penal Code Sections 518-527

53. Fleming restates and re-avers the preceding paragraphs 1 through 44 of this Complaint in and to paragraph 52 of this Count Three.

54. Defendant's conduct complained of above constitutes civil extortion.

55. As a direct and proximate result of Defendant's conduct, Fleming has suffered emotional distress and been damaged in an amount in excess of $75,000 and in an exact amount to be determined at trial.

56. As Defendant's extortion was made with malice in fact, Fleming seeks exemplary damages based upon Defendant's despicable conduct

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial as against Defendant on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Fleming prays for the following relief:

1. On Count One, for money damages due to Defendant's breach of contract;

2. On Count Two, for money damages due to Defendant's acts of defamation and exemplary damages;

3. On Count Three, for money damages due to Defendant's acts of civil extortion and exemplary damages;

4. For such other and further relief as the court may deem just and proper.

Dated this 30th day of June, 2008

Respectfully submitted:

_____
Steven F. Schossberger,
Of the Firm,
HAWLEY TROXELL ENNIS & HAWLEY, LLP
Attorneys for plaintiff Hoyt A. Fleming