STEVEN F. SCHOSSBERGER
California Bar Number 178494
HAWLEY TROXELL ENNIS & HAWLEY, LLP
877 W. Main Street, Suite 1000
Boise, ID 83702
(208) 344-6000
(208) 342-3529 (facsimile)

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOYT A. FLEMING,<br><br>       Plaintiff,<br><br>vs.<br><br>TOM COVERSTONE,<br><br>       Defendant | Case No : 08 CV 355-WQH-NLS<br><br>**AFFIDAVIT OF HOYT A. FLEMING IN OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO STRIKE PURSUANT TO CAL. CODE OF CIV. PROC. SECTION 425.16**<br><br>Hearing Date: July 21, 2008<br>Hearing Time: 11:00 AM<br>Courtroom: 4<br><br>Judge: William Q. Hayes<br>Magistrate Judge: Nita L. Stormes<br>Complaint Filed: February 22, 2008<br>Trial Date: None set |

Hoyt A. Fleming, being first duly sworn upon oath, deposes and says:

1.     I make this affidavit based upon my own personal knowledge and can testify to the truth of these matters if called to testify as a witness at the trial of this action.

---

**AFFIDAVIT OF HOYT A. FLEMING IN OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO STRIKE PURSUANT TO CAL. CODE OF CIV. PROC. SECTION 425.16**

2.    I first met Tom Coverstone ("Coverstone") on January 9, 2008  During that meeting, Coverstone and I discussed Coverstone's purchase of U.S. Patent No 6,204,798, which has been reissued, Reissue Patent No 039,038, Patent Application No. 11/196,841, and Patent Application No. 11/924,352 ("the Intellectual Property"), from me.

3.    Both Coverstone and I are licensed United States patent attorneys. *See* Exhibit A attached hereto and incorporated by reference.

4.    Coverstone is an attorney licensed to practice law in the State of California. *See* Exhibit B attached hereto and incorporated by reference

5.    After the January 9, 2008 meeting with Coverstone, Coverstone and I had additional discussions related to the purchase of the Intellectual Property via telephone.

6.    The discussions culminated on January 22, 2008, with Coverstone orally agreeing to purchase the Intellectual Property from me for $1,000,000

7    In confirmation of the oral agreement, I drafted and sent Coverstone an email entitled "Purchase of Fleming Radar Detector Family"  *See* Exhibit C attached hereto and incorporated by reference.

8    After sending Coverstone the above email, I received an email from Coverstone, entitled "RE: Purchase of Fleming Radar Detector Family". *See* Exhibit D attached hereto and incorporated by reference.

9    On February 15, 2008, I received an email from Coverstone entitled "RE: Coverstone request to return deposit"  *See* Exhibit E attached hereto and incorporated by reference.

AFFIDAVIT OF HOYT A. FLEMING IN OPPOSITION TO DEFENDANT'S SPECIAL
MOTION TO STRIKE PURSUANT TO CAL. CODE OF CIV. PROC. SECTION 425.16
- 2 -                                  3:08 CV 355 WQH-NLS

10.    On February 15, 2008, I received an email from Coverstone entitled "RE: Coverstone request to return deposit" *See* Exhibit F attached hereto and incorporated by reference.

11.    I did not subscribe to Coverstone's blackmail threats. Thus, I did not pay Coverstone the demanded $10,000

12.    On February 22, 2008, I initiated this action by having the original Complaint filed in the United States District Court, Southern District of California. (Docket No. 1.)

13.    On March 12, 2008, I had a First Amended Complaint filed in the United States District Court, Southern District of California. (Docket No. 3.)

14.    Because I did not subscribe to Coverstone's blackmail threats, I believed that Coverstone would make good on his threats to defame me and would publish defamatory statements about me to third parties in an attempt to ruin my reputation. Coverstone's February 15, 2008 emails state ("this (and you) need to be dragged into the light. You do not deserve to be practicing law nor do you deserve to be in the patent fraternity".) *See* Exhibits E and F.

15.    On April 7, 2008, I received a phone call from Mr. Jonathan Fox, a reporter for the Texas Lawyer, a legal interest newspaper. Mr. Fox requested that I comment on a lawsuit entitled "*Guardian Media Technologies, Ltd. and GMI Management Company v. Howrey L.L.P. And Michael S. Dowler*" ("the Texas lawsuit"). I told Mr. Fox that I was not aware of the Texas lawsuit. Mr. Fox then offered to fax me a copy of the Texas lawsuit's complaint ("the Texas Complaint"). I accepted Mr. Fox's offer and Mr. Fox then faxed a copy of the Texas Complaint to my fax machine at 208-342-5363. A true and correct copy of the fax received from Mr. Fox, which is the Texas Complaint, is attached hereto as Exhibit G and incorporated herein by reference. During my conversation with Mr. Fox, I inquired as to how Mr. Fox first learned of

the Texas lawsuit. Mr. Fox told me that he was "tipped off". I requested that Mr. Fox identify the person that provided the Texas Complaint to the Texas Lawyer. Mr. Fox refused to identify the person that provided the Texas Complaint to the Texas Lawyer. After receiving the fax from Mr. Fox, I examined the fax. The far right portion of the fax header on page 2 of the fax indicates that the Texas Complaint had been faxed three times. Two of the faxes are indicated to have 7 pages ("P. 3/7" and "003/007"), while the third fax is indicated to only have 6 pages ("P. 2/6"). The "TO" and "FROM" fax machine numbers are shown for two of the faxes. The fax from "2146511107" to "2083425363" was a 6 page fax from Mr. Fox to me. Likewise, the fax from "7133286863" to "12147412325" is indicated to be a 7 page fax. Unfortunately, the "TO:" and "FROM:" fax numbers for the remaining fax appear to be obscured. *See* Exhibit G.

16      On June 16, 2008, I again spoke with Mr. Fox. I informed Mr. Fox that the publication of the Texas Complaint by the Texas Lawyer defamed me. I again asked Mr. Fox to identify who provided the Texas Complaint to the Texas Lawyer. Mr. Fox stated that he received the Texas Complaint in a fax from Brenda Jeffreys, another reporter with the Texas Lawyer.

17      On June 16, 2008, I spoke with Ms. Jeffreys. Ms. Jeffreys refused to identify the person that faxed the Texas Complaint to the Texas Lawyer.

18.      A true and correct copy of an article entitled "Former Clients Sue Howrey After Alleged Patent Deal Sours" that I downloaded from (http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=900005561466) is attached hereto as Exhibit H and is incorporated by reference.

19.    A true and correct copy of the Texas Complaint that I downloaded from

(http://www.law.com/jsp/tx/PubArticleFriendlyTX.jsp?id=900005509185) is attached hereto as

Exhibit I and is incorporated by reference.

20.    The Texas Complaint that was faxed to me by Mr. Fox contained numerous false,

defamatory, unprivileged statements that had a natural tendency to injure my legal career. Those

statements at least include the following:

> "Both Dowler and Fleming further puffed up the value of the patent."
> "Based on the representations of Dowler and Fleming as to the remarkable value
> of the patent, and the analysis Dowler had allegedly committed to investigating
> the patent, Coverstone expressed his interest in Guardian possibly buying the
> patent for the $1,000,000.00 asking price, subject to Coverstone's review of the
> due diligence materials."
> "Again based on the representations of Dowler and Fleming as to the remarkable
> value of the patent Coverstone continued to express his interest in Guardian
> potentially buying the patent."
> "Both Fleming and Dowler pressured Coverstone to commit to purchase the
> patent. While in the course of traveling and at the insistence and urging of
> Dowler and Fleming, Coverstone was convinced to rush a $10,000 wire transfer
> to Fleming as earnest money on behalf of Guardian."
> "Coverstone on behalf of Guardian thereafter made his own inquiry as to the
> validity and value of the patent, unfortunately learning that the patent did not in
> fact, contrary to what had been represented by Dowler and Fleming, provide
> protection from the potential commercial competitors in the marketplace for the
> product envisioned by the patent and actually had little to no value. Coverstone
> learned that the principal makers of radar detectors were familiar with and not
> concerned about infringing the patent that Dowler had so highly touted. Contrary
> to the representations of Dowler and Fleming, Coverstone discovered that the
> principal makers of radar detectors were able to market, and were already
> marketing, GPS enabled radar detectors without fear of illegally infringing the
> patent that Dowler had been fawning over."
> "After learning that Dowler and Fleming had misrepresented the value of the
> patent, Coverstone told Fleming that he had discovered the misrepresentations
> and the true value of the patent, and that the sale would therefore not go through."
> *See* Exhibit G.

21.    I scanned the second page of the fax of the Texas Complaint that I received from

Mr. Fox. The scan was saved as a .PDF file. I then opened the .PDF file with Adobe Acrobat.    I

---

**AFFIDAVIT OF HOYT A. FLEMING IN OPPOSITION TO DEFENDANT'S SPECIAL
MOTION TO STRIKE PURSUANT TO CAL. CODE OF CIV. PROC. SECTION 425.16**
- 5 -                          3:08 CV 355 WQH-NLS

then used Adobe Acrobat to add annotations to the PDF file    Other than adding 8 red lines and adding text below the 8 red lines, I made no other modifications to the PDF file.  *See* Exhibit J attached hereto and incorporated by reference, which is a true and correct copy of the annotated PDF file.

22.    A true and correct copy of a Google search result for [ "Hoyt Fleming" attorney ] is attached as Exhibit K and incorporated herein by reference.

23    *Defendant's Special Motion to Strike Pursuant to Cal. Code of Civ. Proc. Section 425 16* does not address the publication of the Texas Complaint or the article entitled "Former Clients Sue Howrey After Alleged Patent Deal Sours".  *See* Docket No. 11 and compare to Exhibits G, H, and I.

24.    On February 15, 2008, I was involved in a contract dispute with Coverstone.

25.    Attached hereto as Exhibit L and incorporated by reference is a true and correct copy of the Opening Brief on the Merits for *Flatley v Mauro*, 36 Cal. 4th 299 (2006).

26.    Paragraph 3 of Coverstone's Declaration (Docket No. 11, Attachment No. 2) ("Coverstone's Declaration") states: "Subsequent to that, and up and until the time of filing of this action, we had several communications about the patent and, in particular the possibility of my company purchasing his patent "  Coverstone's statement is false.  On or before the filing of this action, Coverstone and I never had any discussion related to any of Coverstone's companies *purchasing* the Intellectual Property.  To the contrary, all of our purchase discussions related to Coverstone purchasing the Intellectual Property.  Coverstone and I discussed me assigning the Intellectual Property to Coverstone or any entity that Coverstone would designate.  However, all of our purchase discussions related to Coverstone purchasing the Intellectual Property.

27.    Paragraph 3 of Coverstone's Declaration also states: "In January 2008, Mr.

Fleming and I exchanged some e-mails evidencing our intention to put a transaction together

wherein my company would purchase his patent for $1 million if it checked out after a due

diligence period." Coverstone's statement is false. Proof of the falsity can be made by

reviewing the emails exchanged between Coverstone and myself in January 2008. I have

performed an electronic search for emails exchanged between Coverstone and myself in January

of 2008, and I have not located any emails that contain the word "GMT", "due diligence" or

"period". I am not aware of any email exchanged between Coverstone and myself in January

2008 that relates to any of Coverstone's companies purchasing the Intellectual Property. In

addition, on January 22, 2008, when Coverstone agreed to purchase the Intellectual Property,

there was absolutely no contingency agreed to regarding any due diligence period.

28.    Paragraph 5 of Coverstone's Declaration states: "I responded to that e-mail

agreeing to those terms but setting forth an additional term: that his wife must sign off as well.

. I do not recall Mr. Fleming ever consenting to that term, and cannot find any document

demonstrating his assent." During a telephone call occurring just before the email referenced in

paragraph 5 as Exhibit B was received by me, Coverstone and I agreed that my wife Teresa

would also sign the assignment documents needed to transfer the Intellectual Property to

Coverstone or any entity that he designated. In addition, Exhibit B of Coverstone's Declaration

directly contradicts the latter portion of Coverstone's statement. Exhibit B states "As we

discussed on the phone just now, your wife Teresa *will sign* the assignment documents or

whatever is needed." (emphasis added) Exhibit B provides confirmation that I had orally

assented to having my wife sign the assignment documents. The email did not ask *if my wife*

*would sign* the assignment documents. To the contrary, the email states that my wife "will sign" the assignment documents.

29.    Paragraph 6 of Coverstone's Declaration states: "At the time I sent Exhibit "B," I did not intend to formulate a binding contract." I believe that Coverstone's statement is false. Just before Coverstone sent Exhibit B, Fleming asked Coverstone, via telephone, if Coverstone agreed to purchase the Intellectual Property for $1,000,000 according to certain specified terms. Coverstone initially answered my question with "Agreed" and then began to add some qualifying language. At that point, I cut Coverstone off and told him that his qualifying statement was not acceptable. I requested a statement evidencing an unequivocal agreement from Coverstone. Then, Coverstone stated: "I agree." I then told Coverstone that I would send Coverstone a confirming email. In light of the above, I believe Coverstone's statement that Coverstone "did not intend to formulate a binding contract" to be false.

30.    Paragraph 7 of Coverstone's Declaration states: "I discovered that the patent was not worth nearly what Mr. Fleming had represented to me. . .." This statement is false. I have never represented to Coverstone that the Intellectual Property was worth any specific amount. I only told Coverstone that I would sell the Intellectual Property for $1,000,000.

31    Paragraph 7 of Coverstone's Declaration states: " . . . in fact several of his specific contentions (namely a contention that the patent had stopped a Uniden patent from proceeding . . .) were actually inaccurate." This statement is false. On or about February 5, 2008, I told Coverstone, via telephone, that my U.S. Patent No. 6,204,798 was prior art to Uniden's U.S. Patent No. 6,469,653. I inadvertently stated to Coverstone that U.S. Patent No. 6,204,798 was cited *by a patent examiner* that examined the Uniden patent application, when actually, U.S. Patent No. 6,204,798 was cited *by an attorney* that prosecuted the Uniden patent application. A

portion of the second page of the Uniden patent attached hereto as Exhibit M and incorporated herein is shown below.

| 5,916,300 | A | | 6/1999 | Kirk et al. | 701/213 |
|---|---|---|---|---|---|
| 5,917,430 | A | | 6/1999 | Greneker, III et al. | 340/905 |
| 5,955,973 | A | | 9/1999 | Anderson | 340/988 |
| 5,977,884 | A | | 11/1999 | Ross | 340/936 |
| 5,983,158 | A | | 11/1999 | Suzuki et al. | 701/209 |
| 6,169,511 | B1 | | 1/2001 | Iwakuni et al. | 342/20 |
| 6,201,493 | B1 | | 3/2001 | Silverman | 342/20 |
| 6,204,798 | B1 | | 3/2001 | Fleming, III | 342/20 |
| 6,252,544 | B1 | | 6/2001 | Hoffberg | 342/357.1 |
| 6,265,989 | B1 | | 7/2001 | Taylor | 340/901 |
| 6,384,776 | B1 | * | 5/2002 | Martin | 342/357.09 |

* cited by examiner

As is evident from the above portion, my "Fleming, III" patent (U.S. Patent No. 6,204,798 B1) does not have an "*" next to it that indicates that the patent was cited by the U.S. Patent Office Examiner. Thus, my "Fleming, III" patent (U.S. Patent No. 6,204,798 B1) was cited by an attorney prosecuting the Uniden patent application. On or about February 5, 2008, I inadvertently recalled that my "Fleming, III" patent (U.S. Patent No. 6,204,798 B1) had an "*" next to it. Nonetheless, I have never communicated to Coverstone that my U.S. Patent No. 6,204,798 "stopped a Uniden patent from proceeding."

32.    Paragraph 7 of Coverstone's Declaration states: "in fact several of his specific contentions (namely . . . that an Escort patent could not get around his patent portfolio) were actually inaccurate." This statement is false. On May 30, 2006, the U.S. Patent Office rejected claims 96 – 116 of Escort's U.S. Patent Application No. 10/396,881 under 35 U.S.C. 102(e) as being anticipated by one of my U.S. Patent No. 6,204,798. *See* page 2 of *Office Communication*

*of May 30, 2006,* which is attached hereto as Exhibit N and incorporated by reference. Escort's U.S. Patent Application No. 10/396,881 was abandoned after the May 30, 2006 rejection. *See page 2 of Office Communication of January 9, 2007,* which is attached hereto as Exhibit O and incorporated by reference.

33.    Paragraph 8 of Coverstone's Declaration states that I made statements relating to a "modified contract". I never utilized the phrase "modified contract" in any statement to Coverstone because the only contract that Coverstone and I had was the contract of January 22, 2008

34.    Paragraph 8 of Coverstone's Declaration states: "Mr. Fleming also offered to remove Vineyard Boise from the transaction entirely, provided that I pay him an extra $25,000 in order to offset his intended tax benefit." That statement is false. At some point in February 2008, for new and additional consideration of $12,500, I offered to remove Vineyard Boise from the January 22, 2008 contract.

35.    Paragraph 9 of Coverstone's Declaration states: "As a consequence of this ongoing issue and my due diligence, I determined that GMI was not willing to go through with the transaction or complete the remaining documents. I so informed Mr. Fleming." That statement is false. Proof of the falsity can be made by reviewing the email entitled "RE: File History", which is attached hereto as Exhibit P and incorporated by reference. Exhibit P does refer to the proposed alternate purchase arrangement involving less money up front and a share of any money made through the Intellectual Property, as stated in Coverstone's statement. However, Exhibit P does not refer to any of Coverstone's companies. Exhibit P does not state that any of Coverstone's companies are "not willing to complete the transaction." In particular, Exhibit P does not refer to Coverstone's "GMI" company at all. To the contrary, in Exhibit P Coverstone

repeatedly uses the personal pronoun "I" and not "GMI." For example, Exhibit P states: "I don't agree with your advising me that we have a binding agreement for this purchase yet", "I don't intend a contract until this is done", and "I am still willing to negotiate in good faith. To that end, I offer you $250,000 plus 20% on the back end. If you are not interested in this offer, then we need to make arrangements for the return of the $10,000 I put toward the purchase of the patents".

36    Paragraph 10 of Coverstone's Declaration states "We then exchanged a number of e-mails back and forth. . . . A true and correct [sic] of those e-mails discussing settlement are lodged herewith as Exhibits "E," "F," "G," "H," and "I." . . As can be seen from the face of the emails, they were all within a few days of one another. At that time, I was prepared to file a lawsuit on behalf of GMI (as I indicated in my correspondence) in the event we were not able to reach a satisfactory resolution." No correspondence between Coverstone and myself, including but not limited to Exhibits E, F, G, H, and I of Coverstone's Declaration, indicate that Coverstone was prepared to file a lawsuit *on behalf of* any company, including GMI Management Co. I have reviewed Exhibits E, F, G, H, and I of Coverstone's Declaration and cannot find the word "GMI" or any phrase indicating that Coverstone was prepared to file a lawsuit on behalf of any company in the Exhibits. Proof of the falsity of Coverstone's statement can be made by reviewing Exhibits E, F, G, H, and I of Coverstone's Declaration.

37.    Paragraph 12 of Coverstone's Declaration states "For example, his statements about his portfolio's impact on the Uniden patents, which were of significance to me, were inaccurate. I believed, and still believe, that I was entitled to return of my deposit on account of the fact that I had relied upon his misrepresentations to put down my deposit in the first instance." Coverstone's statement is false. As discussed in ¶ 31 above, my inadvertent

statement that my U.S. Patent No. 6,204,798 was cited *by the patent examiner* that examined the Uniden patent application, when actually, my U.S. Patent No. 6,204,798 was cited *by an attorney* that prosecuted the Uniden patent application occurred on or about February 5, 2008. Coverstone paid the $10,000 deposit on January 23, 3008, approximately thirteen days *before* I made the inadvertent statement. *See* January 23, 2008 Wire Transfer Confirmation, which is attached hereto as Exhibit Q and incorporated herein by reference. (The bank account numbers have been redacted.)


Further you affiant sayeth naught.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



Hoyt A. Fleming

STATE OF IDAHO            )
                          ) ss.
County of Ada             )

    On this __7__ day of July, 2008, before me, _Steven F. Schossberger_____, a Notary Public in and for said state, personally appeared Hoyt A. Fleming, known or identified to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written

_Steven F. Schossberger_____
Notary Public for Idaho
Residing at _Ada County, IDAHO_____
My commission expires _____10-11-2008___

AFFIDAVIT OF HOYT A. FLEMING IN OPPOSITION TO DEFENDANT'S SPECIAL MOTION TO STRIKE PURSUANT TO CAL. CODE OF CIV. PROC. SECTION 425.16
- 13 -

3:08 CV 355 WQH-NLS

44015 0001 1239430 1