# S128429

### IN THE
## SUPREME COURT OF THE
## STATE OF CALIFORNIA

---

MICHAEL FLATLEY,

          *Plaintiff and Respondent,*

*vs.*

D. DEAN MAURO, et al.,

          *Defendant and Appellant.*

---

SUPREME COURT
**FILED**

FEB 1 5 2005

Frederick K. Ohlrich Clerk

Deputy

---

*After a Decision by the Court of Appeal,*
*Second Appellate District, Division 5, Civ. No. B171570*

---

## OPENING BRIEF ON THE MERITS

---

**SEDGWICK, DETERT, MORAN & ARNOLD, LLP**
James J.S. Holmes (Bar No. 126779)
Christina J. Imre (Bar No. 96496)
Douglas J. Collodel (Bar No. 112797)
Orly Degani (Bar No. 177741)
801 South Figueroa Street, 18th Floor
Los Angeles, California 90017-5556
Telephone: (213) 426-6900
Facsimile: (213) 426-6921
james.holmes@sdma.com

**Attorneys for Defendant and Appellant**
**D. DEAN MAURO**

**EXHIBIT L**

# TABLE OF CONTENTS

Page

ISSUES PRESENTED ........................................................................... 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE CASE ............................................................. 5

    A.   Plaintiff Flatley And Defendant Mauro's Client Have A Sexual Encounter, Which Mauro's Client Contends Was Rape ............................................................. 5

    B.   After The Client Hires Mauro To Represent Her, Mauro Makes A Pre-Litigation Settlement Demand On Flatley ......................................................... 6

    C.   Flatley Files The Present Action, Denying The Rape And Alleging Mauro's Settlement Demand Was Extortion ........................................................ 8

    D.   Mauro Moves To Strike Flatley's Complaint Under The Anti-SLAPP Statute. The Trial Court Denies The Motion ........................................................... 9

    E.   The Court Of Appeal Affirms, Holding The Anti-SLAPP Statute Inapplicable Because Mauro "Effectively Conceded" His Settlement Demand Was "Extortionate." ................................................ 11

    F.   Mauro Unsuccessfully Petitions For Rehearing, (1) Disputing He Conceded The Demand Was Extortionate, and (2) Arguing The Demand Was Protected By The Anti-SLAPP Statute And Litigation Privilege Regardless. .......................... 14

    G.   This Court Grants Mauro's Petition For Review ............ 16

LEGAL DISCUSSION ...................................................................... 16

I.   THE COURT OF APPEAL ERRONEOUSLY CONCLUDED MAURO'S SETTLEMENT DEMAND WAS AN *INDISPUTABLE* ACT OF EXTORTION ............ 16

# TABLE OF CONTENTS

Page

A.  Whether a Settlement Demand Is Permissible Hard Bargaining Or Amounts To Unlawful Extortion Is A Question Of *Fact* Dependent On The Surrounding Circumstances .................................................................. 16

B.  The Court of Appeal Mischaracterized The Nature Of Mauro's Settlement Demand And Improperly Resolved Factual Disputes Against Him ................................. 21

II  THE COURT OF APPEAL FAILED TO RECOGNIZE THAT EVEN AN "EXTORTIONATE" OR OTHERWISE UNETHICAL SETTLEMENT DEMAND IS WITHIN THE PURVIEW OF THE ANTI-SLAPP STATUTE .................................................................................. 25

A.  By Its Plain Terms, The Anti-SLAPP Statute Does Not Require That Litigation-Related Communication Be Lawful Or Satisfy Rules Of Professional Conduct To Qualify As An Act In Furtherance Of The Right To Petition ......................... 25

B.  Because The Litigation Privilege Completely Bars Civil Actions Arising From Unlawful Or Unprofessional Litigation-Related Communication, Including Extortion, Such Communication Also Deserves The Anti-SLAPP Statute's More Limited Procedural Protection ..................................................... 30

    1.  The litigation privilege provides absolute immunity from civil liability for litigation-related communication that is unlawful or violates a rule of professional conduct ............... 30

    2.  There is no exception taking extortion, but not other kinds of unlawful litigation-related communication, outside the scope of the litigation privilege ............................................. 33

## TABLE OF CONTENTS

Page

3.   As this court has correctly observed, the anti-SLAPP statute is at least as broad, if not broader, than the litigation privilege ...... 37

4.   Lower courts have applied the anti-SLAPP statute to "extortionate" settlement demands ...... 39

CONCLUSION ...... 42

CERTIFICATE OF WORD COUNT ...... 43

iii

# TABLE OF AUTHORITIES

Page

## Cases

*1-800 Contacts , Inc. v. Steinberg*
(2003) 107 Cal.App.4th 568 ................................................................11, 24

*Aronson v. Kinsella*
(1997) 58 Cal.App.4th ........................................................................31

*Asia Investments Co., Ltd. v. Borowski* (1983)
133 Cal.App.3d 832 ............................................................17, 18, 31

*Blanchard v. DIRECTV*
(2004) 123 Cal.App.4th 903 ...............................................34, 36, 39, 40

*Bradley v. Hartford Accident & Indemnity Co.*
(1973) 30 Cal.App.3d 818 ..................................................................35

*Braun v. Chronicle Publishing Co.*
(1997) 52 Cal.App.4th 1036 ...............................................................26

*Briggs v. Eden Council for Hope & Opportunity*
(1999) 19 Cal.4th 1106 ..............................................................*passim*

*Budwin v. American Psyhological Assoc.*
(1994) 24 Cal.App.4th 875 ................................................................33

*Carden v. Getzoff (1987)*
190 Cal.App. 3d 907 ..........................................................................32

*Carney v. Rotkin, Schmerin & McIntyre*
(1988) 206 Cal.App.3d 1513 ........................................................34, 35

*Chavez v. Mendoza*
(2001) 94 Cal.App.4th 1083 ..........................................................11, 24

*Church of Scientology v. Wollersheim*
(1996) 42 Cal.App 4th 628 .........................................................27, 30, 36

*City of Cotati v. Cashman*
(2002) 29 Cal.4th 69 ...............................................................27, 28, 37

i

## TABLE OF AUTHORITIES

Page

*ComputerXpress, Inc v. Jackson*
(2001) 93 Cal.App.4th 993 .................................................................26

*Dickens v. Provident Life and Accident Ins Co*
(2004) 117 Cal.App.4th 705 ...............................................................37

*Doctors' Company Ins. v. Superior Court*
(1990) 225 Cal App. 3d 1284 .............................................................32

*Dove Audio, Inc. v. Rosenfeld, Meyer & Sussman*
(1996) 47 Cal.App.4th 777 ...........................................................31, 37

*Dowling v. Zimmerman*
(2001) 85 Cal.App. 4th 1400 ..............................................................31

*Equilon Enterprises v. Consumer Cause, Inc.*
(2002) 29 Cal.4th 53 ....................................................................passim

*Flatley v. Mauro*
(2004) 121 Cal.App.4th 1523 .......................................................passim

*Fox Searchlight Pictures, Inc v. Paladino*
(2001) 89 Cal.App.4th 294 ...........................................................11, 24

*Gallimore v. State Farm Fire & Casualty Ins. Co.*
(2002) 102 Cal.App.4th 1388 ......................................................25, 26

*Gates v. Discovery Communications, Inc.*
(2004) 34 Cal.4th 679 .........................................................................19

*Gilbert v. Nat'l Enquirer, Inc.*
(1996) 43 Cal.App.4th 1135 ...............................................................19

*Governor Gray Davis Committee v. American Taxpayers Alliance*
(2002) 102 Cal.App.4th 449 ...............................................................24

*Guillemin v. Stein*
(2002) 104 Cal.App.4th 156 ...............................................................17

*Hagberg v. California Federal Bank FSB*
(2004) 32 Cal. 4th 350 ...........................................................30, 31, 33

# TABLE OF AUTHORITIES

Page

*Home Ins. Co. v. Zurich Ins. Co.*
(2002) 96 Cal.App.4th 17 .................................................... 32

*In re George T.*
(2004) 33 Cal.4th 620 ........................................................ 18

*Izzi v. Rellas*
(1980) 104 Cal.App.3d 254 ................................................. 17

*Jarrow Formulas, Inc. v. LaMarche*
(2003) 31 Cal.4th 728 ............................................. 27, 30, 38

*Kachig v. Boothe*
(1971) 22 Cal.App.3d 626 .................................................. 32

*Kashian v. Harriman*
(2002) 98 Cal.App.4th 892 ......................... 24, 34, 35, 37

*Ketchum v. Moses*
(2001) 24 Cal.4th 1122 ....................................................... 27

*Kinnamon v. Staitman & Snyder*
(1977) 66 Cal.App.3d 893 ........................................... 34, 35

*Knoell v. Petrovich*
(1999) 76 Cal.App.4th 164 .......................................... 31, 34

*Larmour v. Campanale*
(1979) 96 Cal.App.3d 566 ........................................... 17, 31

*Lerette v. Dean Witter Organization, Inc.*
(1976) 60 Cal.App.3d 573 ...................................... 17, 31, 32

*Lieberman v. KCOP Television, Inc.*
(2003) 110 Cal.App.4th 156 ........................................ 11, 24

*Ludwig v. Superior Court*
(1995) 37 Cal.App.4th 8 ..................................................... 38

*McKay v. Retail Automobile Salesmen's Local
Union No. 1067*
(1940) 16 Cal.2d 311 ................................................... 19, 20

# TABLE OF AUTHORITIES

Page

*Morrison v. Rudolph*
(2000) 103 Cal.App.4th 506 .................................................. 23

*Navellier v. Sletten*
(2003) 106 Cal.App.4th 763, 770 ........................................ 38

*Navellier v. Sletten*
(2002) 29 Cal.4th 82 ............................................ 24, 27, 28

*Nguyen v. Proton Technology. Corp.*
(1999) 69 Cal.App.4th 140 .................................................. 34

*O'Neil v. Cunningham*
(1981) 118 Cal.App.3d 466 ................................................. 32

*Paul for Council v. Hanyecz*
(2001) 85 Cal.App.4th 1356 ....................................... 11, 24, 29

*People v. Hesslink*
(1985) 167 Cal.App.3d 781 .................................................. 20

*People v. Toledo*
(2001) 26 Cal.4th 221 ...................................................... 18

*Pettitt v. Levy*
(1972) 28 Cal.App.3d 484 ................................................... 31

*Philippine Export and Foreign Loan GuaranteeCorp. v. Chuidian*
(1990) 218 Cal.App.3d 1058 ......................................... 16, 18, 20

*PG&E v. Bear Stearns*
(1990) 50 Cal.3d 1118 ...................................................... 31

*Reader's Digest Assn. v. Superior Court*
(1984) 37 Cal.3d 244 ....................................................... 23

*Roberts v. Los Angeles County Bar Assn*
(2003) 105 Cal.App.4th 604 ................................................. 10

*Ross v. Creel Printing & Publishing Co.*
(2002) 100 Cal.App.4th 736 ................................................. 35

## TABLE OF AUTHORITIES

Page

*Rothman v. Jackson*
(1996) 49 Cal.App.4th 1134 ................................................................ 36

*Rubin v. Green*
(1993) 4 Cal.4th 1187 ........................................................................ 31

*Sacramento Brewing Co., Inc., Plaintiff v. Desmond, Miller &
Desmond*
(2005) 75 Cal.App.4th 1082 ................................................................ 35

*Seidner v. 1551 Greenfield Owners Assoc.*
(1980) 108 Cal.App. 3d 895 ................................................................ 18

*Shekhter v. Financial Indemnity Co.*
(2001) 89 Cal.App 4th 141 ................................................... 12, 19, 41

*Silberg v. Anderson*
(1990) 50 Cal.3d 205 ................................................................. *passim*

*Sipple v. Foundation for National Progress*
(1999) 71 Cal.App.4th 226 ................................................................ 19

*Steiner v. Eikerling*
(1986) 181 Cal.App.3d 639 ................................................................ 32

*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.*
(2004) 122 Cal.App.4th 1049 ............................................................. 37

*Tavernetti v. Superior Court*
(1978) 22 Cal.3d 187 ......................................................................... 20

*Wang v. Hartunian*
(2003) 111 Cal.App.4th 744 ............................................................... 37

*Wilcox v. Superior Court*
(1994) 27 Cal.App.4th 809 ................................................................. 25

*Zamos v. Stroud*
(2004) 32 Cal.4th 958 .................................................................. 21, 23

## TABLE OF AUTHORITIES

**Page**

### Federal Cases

*Gentile v State Bar of Nevada*
  (2001) 501 U.S. 1030 ................................................................... 19

### Out-of-State Cases

*Central Bank v ZIAEE*
  (Ill. 1989) 544. N.E.2d 1121 ......................................................... 7

*Vegelahn v Guntner*
  (Mass. 1896) 44 N.E. 1077 .......................................................... 20

### Statutes

*Civ. Code § 47(b)* ................................................................ *passim*

*Code Civ. Proc. §§ 45, 46* ............................................................ 22

*Code Civ. Proc. § 425.16* ...................................................... *passim*

*Pen. Code § 518* ........................................................... 13, 18, 23

*Pen. Code § 519* ...................................................................... 13

### Rules

*ABA Code of Prof. Ethics,* canon 15 ............................................... 17

*Cal. State Bar, Rules Prof. Conduct,* rule 5-100(A) ............................ 14

*Cal. State Bar, Rules Prof. Conduct,* rule 6-101(2) ............................ 17

### Other Authorities

*Arkin,* Blackmail And The Practice Of Law, Part I,
  (1995) New York L.J. 25 ....................................................... 16, 20

Green, *Zealous Representation Bound: The Intersection Of
  The Ethical Code And The Criminal Law*
  (1991) 69 N.C. L. Rev. 687, 706 .................................................. 18

# S128429

## In The
## Supreme Court of the
## State of California

---

**MICHAEL FLATLEY,**

*Plaintiff and Respondent,*

*vs*

**D. DEAN MAURO, et al.,**

*Defendant and Appellant*

---

*After a Decision by the Court of Appeal,*
*Second Appellate District, Division 5, Civ. No. B171570*

---

## OPENING BRIEF ON THE MERITS

---

### ISSUES PRESENTED

     1.    Is an attorney's pre-litigation settlement demand to an international celebrity unlawful extortion *as a matter of law*, simply for warning that, absent a settlement, the attorney will file a civil lawsuit on a client's behalf, disseminate information about the lawsuit to the press, and

report to appropriate authorities any violations of law that *may* be revealed through discovery?

2.      Assuming that a settlement demand or other litigation-related communication is "extortionate," otherwise unlawful, or violates a rule of professional conduct, does that communication nonetheless constitute an act in furtherance of the right to petition that satisfies the defendant's initial burden under the anti-SLAPP statute (Code of Civil Procedure section 425.16)? Stated differently, can "unlawful" or "unprofessional" litigation-related activity that is *absolutely protected* by the litigation privilege (Civil Code section 47, subdivision (b)) be *denied* the more limited, purely procedural protection of the anti-SLAPP statute?

## INTRODUCTION

Petitioner/Defendant D. Dean Mauro, a lawyer, represented a woman who contends that plaintiff Michael Flatley, an international celebrity, raped her. The victim retained Mauro to pursue a civil lawsuit against Flatley for damages arising from the rape. Mauro made a settlement demand on Flatley before initiating formal legal action, warning that unless Flatley agreed to pay an appropriate settlement amount, Mauro would file the client's lawsuit. Because he was dealing with a public figure accused of sexual misconduct – a highly newsworthy subject – Mauro cautioned that he would exercise his right to inform the press about the lawsuit and that, due to Flatley's celebrity status, the resulting media coverage would be extensive and adverse. Further, Mauro warned that, if discovery in the lawsuit revealed that Flatley had committed any other crimes, Mauro would report them to proper authorities.

Flatley responded by suing Mauro, alleging civil extortion, intentional infliction of emotional distress, and wrongful interference with prospective economic advantage, all based exclusively on Mauro's settlement demand. Flatley contended Mauro was liable for threatening to file the lawsuit and fuel publicity about it. Flatley also contended Mauro was liable for threatening to report the rape to police, even though Mauro made no such threat. In fact, Mauro made it clear the client had *already* filed a police report about the rape.

Mauro responded by filing an anti-SLAPP special motion to strike Flatley's complaint. Both the trial court and the court of appeal concluded, wrongly, that the anti-SLAPP statute did not apply to Mauro's communications in anticipation of litigation.

First, the court of appeal held Mauro's settlement demand amounted to criminal extortion *as a matter of law* by concluding the demand was *defamatory* and therefore *extortionate*. But whether the settlement demand was "defamatory" turned on whether Flatley *committed the rape*, a vigorously contested fact question. In other words, the court improperly resolved this factual issue, and many others, against Mauro *on review of an anti-SLAPP motion*. The court also ignored decades of case law recognizing that, for the American adversarial system to function as intended, lawyers must be free from the specter of subsequent or retaliatory lawsuits arising out of their litigation-related conduct. According to the court of appeal's decision, lawyers may be exposed not only to civil liability but criminal prosecution whenever they make aggressive settlement demands in pursuit of their clients' interests.

Second, relying on its insupportable *assumption* that Mauro committed extortion, the court of appeal held the anti-SLAPP statute does

not apply to "extortionate" settlement demands or any other unlawful or unethical litigation-related activity. Thus, a plaintiff alleging a cause of action based on such activity need not even minimally substantiate the asserted claim before embarking on protracted and burdensome litigation. The court thereby ignored the plain words of the anti-SLAPP statute and the Legislature's explicit command that the statute be construed *broadly* to safeguard the rights of free speech and petition. Moreover, the court did not even address Mauro's argument that since petitioning activity is *absolutely* protected by the litigation privilege, even when unlawful or unethical, it is, a fortiori, also entitled to the more limited, purely procedural protection of the anti-SLAPP statute. Indeed, the court's opinion did not even mention Mauro's absolute defense to liability, the litigation privilege, except in passing.

Mauro's anti-SLAPP motion should have been granted because it satisfies both prongs of the statute. Beyond question, his settlement demand was made in furtherance of the right of petition. It was litigation-related activity and there was no basis to conclude that, as a matter of law, the demand was "extortionate" or otherwise "illegal." Moreover, whether the demand was extortionate or not, it is *absolutely protected* by the litigation privilege. That privilege applies equally to legal and illegal conduct alike. Thus, Mauro satisfied both prongs of the anti-SLAPP statute: this was petitioning activity and Flatley could not possibly prevail at trial because of Mauro's absolute defense.

With its two related holdings, i.e., finding the settlement demand illegal as a matter of law and refusing to recognize that the SLAPP statute applies, the court of appeal effectively cracked the "backbone" of the adversarial system. (*Silberg v Anderson* (1990) 50 Cal.3d 205, 215.) If

4

affirmed, these rulings will inhibit lawyers from effectively representing their clients, in the bargain jeopardizing clients' rights of access to the courts. Unless this court reverses, lawyers making pre-litigation communications will be looking over their shoulder at the prospect of retaliatory lawsuits, with no way of telling the difference between zealous pursuit of favorable settlements and impermissible "criminal" conduct. Inevitably, they will second-guess their settlement demands, justifiably fearful that simply telling their adversary what they intend to do, legally can do, and are even ethically *required* to do unless the adversary agrees to settle, will expose them to collateral litigation, personal financial liability, possible criminal prosecution, and/or disciplinary action that could include loss of their license to practice law. The right of petition cannot survive the resulting chill on effective legal representation.

## STATEMENT OF THE CASE

### A.    Plaintiff Flatley And Defendant Mauro's Client Have A Sexual Encounter, Which Mauro's Client Contends Was Rape.

Plaintiff Flatley is a well-known performer who participates in Irish dance troupe performances throughout the world. (2CT 313; 3CT 502.)[1] Defendant Mauro is an Illinois lawyer. (2CT 350.) Mauro's client, Ms. Robertson, a resident of Illinois, met Flatley during a boxing match in Las Vegas. (2CT 313, 352.) At Flatley's invitation, she returned to Las Vegas a

---

[1]    In this brief, "CT" refers to the Clerk's Transcript on Appeal, "AOB" refers to Mauro's Appellant's Opening Brief, "ARB" refers to Mauro's Appellant's Reply Brief, "PFRH" refers to Mauro's Petition for Rehearing, "PFR" refers to Mauro's Petition for Review, and "APFR" refers to Flatley's Answer to the Petition for Review.

few weeks later, in October 2002, to visit him. (2CT 313-314, 345, 352; 3CT 499-500, 503.) According to Robertson, Flatley raped her during this visit. (2CT 342, 351-353.)

**B.    After The Client Hires Mauro To Represent Her, Mauro Makes A Pre-Litigation Settlement Demand On Flatley.**

After seeking medical attention and filing a police report about the rape (2CT 351-360), Robertson hired Mauro to represent her in civil proceedings against Flatley. In January 2003, before initiating any formal legal action, and in an effort to avoid protracted litigation on an emotional subject, Mauro faxed a settlement demand to Flatley (in Las Vegas). (2CT 334-339.)

Mauro's letter reflected it was governed by federal and state law and "[a]ll information contained herein is for settlement purposes only." (2CT 336, 339.) Mauro told Flatley he "represent[s] a woman with whom you engaged in forcible sexual assault on or about October 19-20, 200[2]." (2CT 336.) Mauro identified the Las Vegas Police Department crime report concerning the rape (number 02-1114-1768), made on the day of the incident. (2CT at 336.) He also attached a copy of his client's November 17, 2002, letter to the sex crimes unit of the Las Vegas Police Department, which supplemented her original rape report and subsequent conversation with a local police detective. (2CT 351-353.) In addition, Mauro attached his client's relevant medical records and a copy of her proposed Illinois civil complaint against Flatley. (2CT 340-350, 354-360.)

In the letter, Mauro advised that "we have retained several forensic expert witnesses who, in addition[] to our client's treating medical personnel, have already completed thorough investigations and shall be testifying on our behalf." (2CT 337.)    Mauro enclosed biographical

information regarding these experts and plaintiffs' attorneys. (2CT 361-390.) He also discussed the experts' conclusions supporting grounds for pursuing compensatory and punitive damages arising from the assault. (2CT 338.)

Mauro gave Flatley until January 30, 2002, to respond to the settlement demand. (2CT 337.) He noted (in boldface and italics) that the amounts claimed in the lawsuit were "naturally negotiable prior to suit," but that any and all offers to compromise would be "automatically withdrawn" after that time. (2CT 337.) Mauro warned that Flatley's failure to settle "shall result in us immediately filing a lawsuit against you." (2 CT 337.) He noted that, if a lawsuit were filed, information about Flatley's personal assets would become public record following the discovery process because the information "must be filed with the court" in connection with proposed expert testimony on punitive damages. (2CT 338; see *Central Bank v. ZIAEE* (Ill. 1989) 544 N.E.2d 1121, 1127 [wealth evidence admissible on punitive damages claim].) He also warned that this or any other information revealed during discovery, such as information concerning immigration, social security and tax issues, *if in violation of any law*, would be turned over to appropriate authorities. (2CT 338.) Finally, stating the obvious to an international celebrity, Mauro cautioned Flatley that he would release information about the lawsuit and underlying allegations to the press, which would generate extensive, negative and potentially ruinous media attention. (2CT 338, 339.)

In late January 2003, Mauro received two letters from Flatley's Los Angeles counsel, Bertram Fields, purportedly in response to Mauro's settlement overture. (2CT 335:7-11, 391, 392; see also 2CT 422:24-26.) Mauro responded to Fields' letters, again attempting to reach a settlement.

(2CT 335:12-13, 393.)   After settlement efforts proved fruitless, Mauro filed Robertson's complaint against Flatley in Illinois state court in March 2003.[2] (2CT 335:14-21, 340-350, 395-405.)

## C.    Flatley Files The Present Action, Denying The Rape And Alleging Mauro's Settlement Demand Was Extortion.

Two days after Mauro filed the Illinois action, Flatley responded with the instant lawsuit against Mauro and his client. (1CT 7-16.) The operative second amended complaint accuses Mauro and Robertson of engaging in "a vicious and criminal scheme . . . to extort money from plaintiff by asserting demonstrably false claims of sexual misconduct by [Flatley] and threatening to publicize those false claims throughout the world." (2CI 312.) The complaint is a vituperative, ad hominem, salacious attack on Robertson's character, containing irrelevant allegations that she is "an ex-stripper, who was a habitué of gambling casinos in Las Vegas and elsewhere, had declared bankruptcy to avoid paying her gambling and other debts, has been sued for charging over $460,000 of personal items to a company credit card and also for passing dishonored checks and had engaged in extorting money and other financial benefits from men." (2CT 313.)

Against lawyer Mauro, the complaint alleges three causes of action: civil extortion, intentional infliction of emotional distress, and wrongful interference with prospective economic advantage. (2CT 317-318, 320-321.) It attacks Mauro solely for his pre-litigation settlement demand letter

---

[2]    Robertson subsequently dismissed the state court action and re-filed her complaint against Flatley in Illinois federal district court on October 19, 2004. (See *Robertson v. Flatley*, N.D.Ill., Eastern Div., Case No. 04C-6742.)

and for three subsequent telephone conversations Mauro allegedly had with Flatley's counsel concerning the settlement demand. (2CT 312-326 [see ¶¶9-11].)

**D.    Mauro Moves To Strike Flatley's Complaint Under The Anti-SLAPP Statute. The Trial Court Denies The Motion.**

Mauro filed a special motion to strike the causes of action against him under the anti-SLAPP statute, Code of Civil Procedure section 425.16. (2CT 334 - 3CT 417.) He contended Flatley's claims arose from acts in furtherance of Mauro's exercise of free speech and petition rights, i.e., his representation of his client in another lawsuit, including his pre-litigation settlement letter and follow-up communications on her behalf. (2CT 409–3CT 417.) Mauro also contended Flatley could not meet his burden to show a probability of prevailing on any of his claims because the litigation privilege, Civil Code section 47, subdivision (b), absolutely protects Mauro's challenged actions. (2CT 409- 3CT 417.)

Flatley opposed the special motion to strike, relying entirely on his assertion that Mauro had committed "extortion." He argued Mauro's communications were "extortionate" and hence did not fall within the anti-SLAPP statute. (3CT 516-535, 521:2-7, 525:16-527:2.) He also contended the litigation privilege was inapplicable because Mauro's communications were "extortionate." (3CT 521:8-14, 527-535.)

In support of his opposition to the anti-SLAPP motion, Flatley submitted five declarations. (3CT 421-515.) The first, Flatley's own, focused on his claim that his sexual encounter with Mauro's client was consensual, i.e., not rape. But Flatley also went out of his way to repeat his complaint's allegations smearing Robertson's character, attached newspaper articles purporting to substantiate these allegations, and added

9

that he expected to present "admissible evidence of these facts" at trial. (3CT 502:27-504:11 )[3]  Flatley also expressed his personal perceptions about how the allegations in the Illinois action, and the related publicity that *followed* the filing of what he termed a "bogus" lawsuit, have affected him (3CT 505-507.)

The second declaration, by Flatley's personal secretary, purported to substantiate Flatley's version of the incident – i.e., that no rape occurred. (3CT 499-501.)

The remaining declarations were from three of Flatley's attorneys. Two of the attorneys recounted their alleged communications with Mauro after receiving his demand letter, during which Mauro purportedly said he and his client would "go public" unless an acceptable "seven figures" settlement were paid. (3CT 422:12-15, 425:25-427:2.)  The third attorney declaration described a television program in which Mauro and his client purportedly gave an interview about her rape claim after the Illinois action was filed. (3CT 514.)

The trial court denied Mauro's special motion to strike, ruling Mauro did not meet his threshold burden under section 425.16 to show Flatley's causes of action arise from protected speech or petition activity. (3CT 607.) The trial court reasoned Mauro's settlement demand "threaten[ed] criminal prosecution and publication of *false* claims to 'ruin' Plaintiff." (3CT 607,

---

[3]    Mauro objected to this portion of Flatley's declaration as inadmissible character evidence, hearsay, and lacking foundation. (3CT 593-596; see *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 613-614 [to survive anti-SLAPP special motion to strike, plaintiff must demonstrate probability of prevailing on merits of claims with competent evidence that would be *admissible at trial*] )

emphasis added.)    In arriving at its conclusion based on a *factual assumption* that Roberston's rape charge is "false" (3CT 607), instead of assuming the truth of her allegations, the trial court committed an error that the court of appeal would later elaborate. As will be shown, in affirming the denial of the anti-SLAPP motion, the court of appeal also *assumed* there was no rape and thus concluded Mauro's settlement demand was "extortionate" and "defamatory." However, whether Flatley raped Robertson, as she contends, or they engaged in consensual sex, as he contends, is a question of fact that has yet to be decided by any trier of fact.

**E.    The Court Of Appeal Affirms, Holding The Anti-SLAPP Statute Inapplicable Because Mauro "Effectively Conceded" His Settlement Demand Was "Extortionate."**

Mauro appealed the order denying his special motion to strike. (3CT 608). He argued that under a long line of authority, Flatley's allegation that Mauro's settlement demand amounted to unlawful extortion could not insulate Flatley's claims from the reach of the anti-SLAPP statute. (AOB 17-20, citing *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 165; *1-800 Contacts , Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 583; *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1089; and *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305.) Rather, the alleged illegality of Mauro's conduct was relevant only to the secondary question whether Flatley established a probability of prevailing on the merits of his claims, and Flatley could not meet that burden because of the absolute protection afforded by the litigation privilege. (AOB 17-20.)

The Second Appellate District, Division Five, disagreed, affirming the denial of Mauro's anti-SLAPP motion. (*Flatley v. Mauro* (2004) 121 Cal.App.4th 1523; PFR, Exh. A.) Relying on *Paul for Council v. Hanyecz*

(2001) 85 Cal.App.4th 1356, 1365-1367, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5, the court concluded Mauro failed to satisfy his initial burden to establish applicability of the anti-SLAPP statute because "Mauro has *effectively conceded* and *it is undisputed* his speech and conduct [i.e., his settlement demand letter and subsequent communications with plaintiff's counsel] are ... *unprotected acts of extortion* ... Hence, the burden of proof never shifted to [Flatley] to demonstrate his claims have minimal merit." (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p.1541; Exh. A, p. 22, emphasis added.)

The court of appeal acknowledged that "[n]ormally, conduct of the type engaged in by Mr. Mauro falls within the protective provisions of section 425.16." (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p. 1540; Exh. A, pp. 19-20, citing *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 115 ["communications preparatory to or in anticipation of the bringing of an action or other official proceeding" are protected under section 425.16]; *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908 [filing a lawsuit is protected petitioning activity under the anti-SLAPP statute]; *Shekhter v. Financial Indemnity Co.* (2001) 89 Cal.App.4th 141, 153 [attorney's use of the media is entitled to protection under section 425.16].)

However, the court went on to make a series of erroneous factual assumptions leading to its conclusion that Mauro's settlement demand amounted to unlawful "extortion" and therefore fell outside the scope of the anti-SLAPP statute.

First, the court assumed Mauro threatened to publicly *defame* Flatley through the press, i.e., that *the rape did not actually occur.* (*Flatley v.*

*Mauro, supra,* 121 Cal.App.4th at p. 1540; PFR, Exh. A, pp. 20-21 ["The problem is that Mr. Mauro went further than threatening to file a lawsuit and then disseminate the information about the complaint to journalists. Rather, . . . Mr. Mauro threatened criminal prosecution or publication of *defamatory matter* about the rape as a means of obtaining leverage in the proposed civil action if 'seven figures' was not paid"], emphasis added.)

Next, the court assumed Mauro threatened to report the "false" rape to police, even though Mauro's demand letter clearly revealed *Robertson had already made a police report about the rape.* (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p. 1541; PFR, Exh. A ["Mr. Mauro's written and oral threats to report *plaintiff's alleged rape* to various state, federal, and international authorities were not protected speech"], emphasis added.)

Finally, the court assumed Mauro *conceded* he did these things, conclusively establishing he was guilty of extortion:

> Mauro does not deny he made any of the statements attributed to him. Nor does he seriously dispute his conduct was illegal. . . .
>
> . . . .
>
> The threat of criminal prosecution and to publish *defamatory matters* in order to induce payment of money is extortion under California law. (Pen. Code §§ 518, 519 . . .)[4]

---

[4]    Penal Code section 518 defines extortion as "the obtaining of property from another . . . by wrongful use of force or fear . . ." Penal Code section 519 provides: "Fear, such as will constitute extortion, may be induced by a threat . . . [t]o accuse the individual threatened, or any relative of his, or member of his family, of any crime; . . [t]o expose, or to impute to him or them any deformity, disgrace or crime; or . . . [t]o expose any secret affecting him or them."

> [L]awyers in California and Illinois are also specifically precluded from threatening criminal prosecution as a means of obtaining leverage in a civil action by their respective Rules of Professional Conduct

> . . .

> No prima facie showing has been made that Mr. Mauro's speech and conduct are anything other than unprotected acts of extortion. As a matter of law, Mr. Mauro's speech and conduct [ ] are not protected by our Constitutions.

*(Flatley v. Mauro, supra,* 121 Cal.App.4th at pp. 1534, 1540, 1541, 1542; Exh. A, pp. 21-22, emphasis added, footnotes omitted, citing Cal. State Bar, Rules Prof. Conduct, rule 5-100(A) and Ill. State Bar, Rules Prof. Conduct, rule 1.2(e).)[5]

**F.     Mauro Unsuccessfully Petitions For Rehearing, (1) Disputing He Conceded The Demand Was Extortionate, and (2) Arguing The Demand Was Protected By The Anti-SLAPP Statute And Litigation Privilege Regardless.**

Mauro timely petitioned for rehearing on two grounds. (PFRH 1.) First, he noted "the Court's opinion mistakenly conclude[d] that Mauro 'effectively concede[d]' his speech was criminal, and thus the anti-SLAPP statute cannot be triggered." (PFRH 1.) Mauro argued that, "[a]s shown in his opening and reply briefs, [he] repeatedly asserted his pre-filing

---

[5]     California rule 5-100(A) provides: "A member shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute." The referenced Illinois rule states: "A lawyer shall not present, participate in presenting, or threaten to present criminal charges or professional disciplinary advantage in a civil matter."

communications were privileged, and disputed [Flatley's] contention that these litigation-related communications were extortionate." (PFRH 1.)

Indeed, in his reply brief, Mauro contended that the purported extortion "is belied by the actual language of Mauro's letter, which may be characterized, at most, as rhetorical hyperbole or attorney bravado inspired by the zealous representation of his rape-victim client." (ARB 4.) Mauro observed that "[i]n this post-O.J. Simpson world of celebrity justice, [his] exuberant comments about media exposure and interest were apt." (ARB 6.) Because of Flatley's fame, the media, in fact, "requested (and was granted) permission to photograph, record, or broadcast proceedings" in the present action. (ARB 6.)

Mauro also argued in his reply brief that, although his demand letter indicated pertinent information and documentation would be provided to appropriate authorities, "it is improper for Flatley to characterize this comment as extortion based on a threat of criminal prosecution" because *"the victim had already reported the crime to the police."* (ARB 6.) "Nor does such a threat arise from Mauro's enumeration of the probable consequences attendant to civil litigation involving celebrity sexual assault claims, *viz.*, media coverage, revelation of private information, exposure to financial loss, effect of punitive damage awards, and the *possible* disclosure of violations to law enforcement officials." (ARB 6, emphasis added.)

Second, Mauro argued in his petition for rehearing that, "irrespective of how his speech is characterized, [he] is entitled to absolute protection pursuant to Civil Code section 47(b)" from plaintiff's lawsuit, which is based on Mauro's pre-litigation settlement overtures. (PFRH 1.) "Because the litigation privilege applies — whether the speech is 'extortionate' or not — the first prong of the anti-SLAPP statute has been satisfied." (PFRH 1.)

The court of appeal denied Mauro's petition for rehearing without further comment (PFR, Exh. B.)

G.    **This Court Grants Mauro's Petition For Review.**

Mauro petitioned for this court's review, raising two issues: (1) whether his settlement demand on Flatley amounted to extortion as a matter of law; and (2) whether the limited, procedural protection of the anti-SLAPP statute is inapplicable to an extortionate settlement demand or other unlawful litigation-related activity, when the litigation privilege affords such activity absolute protection. (PFR 1-2.) This court granted Mauro's petition. (*Flatley v. Mauro* (2004) 22 Cal.Rptr.3d 517.)

## LEGAL DISCUSSION

### I.

**THE COURT OF APPEAL ERRONEOUSLY CONCLUDED MAURO'S SETTLEMENT DEMAND WAS AN *INDISPUTABLE* ACT OF EXTORTION.**

A.    **Whether a Settlement Demand Is Permissible Hard Bargaining Or Amounts To Unlawful Extortion Is A Question Of *Fact* Dependent On The Surrounding Circumstances.**

Threats of lawsuits and their fallout, including negative publicity and exposure of crimes, are "common currency" in settlement negotiations, especially when the defendant is a public figure and the underlying facts are salacious. (Atkin, *Blackmail And The Practice Of Law, Part I*, (1995) New York L.J. 25.) As the court of appeal recognized in *Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, "those types of threats [also] pose the most difficult problems in the law of blackmail." (*Id.* at p. 1079.) Their treatment requires careful balancing of

"the values of the adversary system and the rights of persons to be free from pressure that is perceived as 'wrongful.'" (*Ibid.*)

On the one hand, attorneys are ethically obligated to zealously represent their clients' legal interests. (*Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 168.) This duty includes aggressively pursuing settlements, which "have long been favored by the courts." (*Asia Investments Co., Ltd. v. Borowski* (1983) 133 Cal.App.3d 832, 843.) "As any competent attorney is aware, access to the courts is not an end in itself but only one means to achieve satisfaction for a client. If this can be obtained without resort to the courts — even without the filing of a lawsuit — it is *incumbent* upon the attorney to pursue such a course of action first." (*Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 577, citing ABA Code of Prof. Ethics, canon 15 and Cal. State Bar, Rules Prof. Conduct, rule 6-101(2), emphasis added.) Thus, "[i]t is [a] well established legal practice to communicate promptly with a potential adversary, setting out the claims made upon him, urging settlement, and warning of the alternative of judicial action." (*Lerette v. Dean Witter Organization, Inc.*, *supra*, 60 Cal.App.3d at p. 577; see also *Larmour v. Campanale* (1979) 96 Cal.App.3d 566, 568 [same].)

To encourage settlements, attorneys must be "accorded wide latitude in making statements during settlement negotiations." (*Asia Investments Co., Ltd. v. Borowski*, *supra*, 133 Cal.App.3d at p. 843.) "While it is [desirable] that communications between legal adversaries remain amicable throughout any dispute, it is reasonable to expect that communications between plaintiff, defendant and (their) respective counsel may become 'strained' or 'heated' and, for that matter, 'abusive' when each pursues his or her rights to the fullest." (*Izzi v. Rellas* (1980) 104 Cal.App.3d 254, 264.)

LA/590716v1

Forceful, inflammatory, even abusive language is accepted as "part of the adversary system, . . . to be anticipated in the course of 'heated battle' between adverse parties to [judicial] proceedings." (*Ibid*.) Thus, even settlement proposals "made in a manner which might be considered a veiled 'threat,'" are accepted. (*Asia Investments Co., Ltd v. Borowski, supra,* 133 Cal.App.3d at p. 843.)

No doubt, such settlement demands are "coercive." But, by its nature, every settlement demand involves an element of coercion. (*Asia Investments Co., Ltd. v. Borowski, supra,* 133 Cal.App.3d at p. 843, fn. 7; see also *Seidner v. 1551 Greenfield Owners Assoc.* (1980) 108 Cal.App.3d 895, 904-905.) That is the entire point. People rarely *volunteer* to pay substantial amounts of money to compensate those they have wrongfully injured.

On the other hand, obviously not all threats made to induce settlement are permissible. At the extreme, it clearly is improper to "threaten to take action that would not be lawful, such as to 'break a debtor's thumbs in the absence of prompt payment.'" (Green, *Zealous Representation Bound: The Intersection Of The Ethical Codes And The Criminal Law* (1991) 69 N.C. L. Rev. 687, 706.)

The balance lies in the text of Penal Code section 518, which defines extortion as "the obtaining of property from another . . . by *wrongful* use of force or fear . . . ." (emphasis added.)

Not all threats are "wrongful." Some are not only legitimate, but constitutionally protected. (See *In re George T.* (2004) 33 Cal.4th 620; *People v. Toledo* (2001) 26 Cal.4th 221.) Whether a particular threat is "wrongful" turns on the *circumstances* in which it is made. (*Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian, supra,* 218

Cal.App.3d at p. 1080.) The critical question is whether what has been threatened is *lawful*. (*McKay v. Retail Automobile Salesmen's Local Union No. 1067* (1940) 16 Cal.2d 311, 321.)

In general, it is neither unlawful nor unethical for an attorney to file a good faith complaint on behalf of a client whose adversary refuses to settle and to widely disseminate information about the lawsuit and its underlying allegations to the press, particularly when the adversary is a public figure. (See *Gentile v. State Bar of Nevada* (2001) 501 U.S. 1030; *Shekhter v. Financial Indemnity Co., supra,* 89 Cal.App.4th at p. 153.) Indeed, these are matters of constitutional right. (*Shekhter v. Financial Indemnity Co., supra,* 89 Cal.App.4th at pp. 153-154.)

It is an inevitable fact that the media reports widely on lawsuits filed against public figures, especially when, as here, the lawsuits involve sexual misconduct. It also is an inevitable fact of life that public figures sometimes are unable to shake the negative publicity of a lawsuit based on sexual misconduct or other egregious criminal behavior, and that the publicity follows them everywhere, forever tarnishing their reputations to the point of "ruin." It is legal for the media to do this. Indeed, it is a constitutional right. (See, e.g., *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 692-694; *Sipple v. Foundation for National Progress* (1999) 71 Cal.App.4th 226, 237-240; *Gilbert v. Nat'l Enquirer, Inc.* (1996) 43 Cal.App.4th 1135, 1146-1148.)

And, it is legal and by no means unethical for an attorney who in the course of discovery learns that an adversary has committed a crime, to report the crime to appropriate authorities. Indeed, some would say it is the lawyer's civic duty and professional responsibility to do so. (See, e.g.,

*Tavernetti v. Superior Court* (1978) 22 Cal.3d 187, 196 ["by reporting a crime one may fulfill his responsibilities . . . as [a] citizen"].)

Since it is legal to do these things, it also is, in many circumstances, legal to *threaten* to do them in order to induce settlement. As Justice Holmes said: "'I pause here to remark that the word 'threats' often is used as if, when it appeared that threats had been made, it appeared that unlawful conduct had begun. But it depends on what you threaten. As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do, that is, give warning of your intention to do, in that event, and thus allow the other person the chance of avoiding the consequences.'" (*Vegelahn v. Guntner* (Mass. 1896) 44 N.E. 1077, 1081, as quoted in *McKay v. Retail Automobile Salesmen's Local Union No. 1067*, *supra*, 6 Cal.2d at p. 321.)

In some situations, however, even a threat to do something legal can be wrongful when coupled with a demand for money—for example, when the party making the threat has no legitimate claim to what that party seeks to obtain (see, e.g., *People v. Hesslink* (1985) 167 Cal.App.3d 781 [threat to arrest prostitute for solicitation unless she pays money]); or when there is no nexus or logical relationship between the threat and the asserted claim (see, e.g., Arkin, *supra*, 213 New York L.J. 25 [threat to reveal bank president's adulterous affair unless bank settles wrongful discharge claim].)

In virtually every case, though, the point at which a threat crosses the line from legitimate pressure upon an adversary in litigation to criminal extortion is a *factual* question, to be decided in light of the surrounding circumstances. (See *Philippine Export and Foreign Loan Guarantee Corp v. Chuidian*, *supra*, 218 Cal.App.3d at p. 1080.) Only in extremely rare

cases, if ever, can the issue be decided as a matter of law, based on mere allegations or unresolved facts

**B.    The Court of Appeal Mischaracterized The Nature Of Mauro's Settlement Demand And Improperly Resolved Factual Disputes Against Him.**

The court of appeal concluded Mauro's settlement demand constituted the crime of extortion *as a matter of law* because, besides threatening to file a lawsuit and disseminate information about the suit to the media, "Mauro threatened criminal prosecution or publication of *defamatory matter* about the rape" unless plaintiff paid "seven figures." (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p. 1540; Exh. A, p. 20, emphasis added.)

The court's reasoning reveals it misconstrued the evidence and improperly *resolved* disputed factual questions against Mauro. (See *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [in evaluating an anti-SLAPP motion, the court may not weigh the credibility or comparative probative strength of competing evidence].)   In fact, Mauro did *not* "threat[en] to report plaintiff's alleged rape to various state, federal, and international authorities." (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p. 1541; Exh. A, p. 20.) As his letter clearly indicated, Robertson had *already* reported the rape to the Las Vegas police. (2CT 336, 351-353.) The letter referenced the relevant police report number and attached a copy of Robertson's follow-up letter to the sex crimes unit. (2CT 336, 351-352.) Mauro warned only that *if* discovery revealed *other* crimes, such as violations of immigration, social security, or tax laws, *that* information would be turned over to appropriate authorities. (2CT 338.)

There is no competent evidence in the record to support Flatley's assertion that Robertson's report to police was "bogus and deliberately

incomplete," in order to make the subsequent settlement demand more threatening while at the same time prevent the police from taking action on the allegedly false report. (APFR, p. 7, fn. 1.) Nor is there any competent evidence to support Flatley's contention that, "[p]atently, Mauro's written threat . . . encompassed the completion of Robertson's then incomplete report." (APFR, p. 11.) No competent evidence indicates the police report was, in fact, incomplete or explains whether the police pursued the matter or, if not, why not. Even if the report was incomplete, there is nothing in the record to show Mauro knew that, and nothing to substantiate Flatley's allegation that Mauro intended him to believe criminal action concerning the rape would be pursued only if he failed to settle. The court of appeal's statement that Mauro "threat[ened] to report plaintiff's alleged rape to various state, federal, and international authorities" (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p. 1541; Exh. A, p. 20) is simply wrong.

Moreover, Mauro did not threaten to disseminate "defamatory" information about the rape to the press. (*Flatley v. Mauro, supra,* 121 Cal.App.4th at p. 1540; Exh. A, p.20.) The court's use of the word "defamatory" shows it impermissibly *assumed there was no rape.* If the rape did occur, then publicity about the charge could not possibly be defamatory. (See Code Civ. Proc. §§ 45, 46 [defining defamation in the form of either libel or slander as a "*false* and unprivileged publication"], emphasis added.) Although Flatley *contended* there was "uncontradicted" evidence Robertson consented to have sex with him (APFR, pp. 4, 6-7), the issue was, and still is, highly contested. Flatley's assertion relied only on *his version* of what occurred, ignoring Robertson's very different account of the incident. (Compare CT 351-353 with CT 502-507.) In repeatedly describing Mauro's demand as "defamatory" (see *Flatley v. Mauro, supra,*

22

121 Cal.App 4th at p. 1540; Exh A, pp. 20, 21), the court of appeal clearly, and improperly, believed Flatley over Robertson.

Even more to the point, whether a rape occurred or not, what matters with respect to Mauro is what he knew (i.e., his state of mind) when he made the settlement demand. If Mauro believed in good faith in the validity of Robertson's claim, then his effort to obtain for her financial compensation from Flatley could not have been "wrongful." (Pen. Code § 518; see also *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253 [to prove defamation, a public figure must demonstrate false information was disseminated *with actual malice*].) There is no evidence Mauro knew anything other than what Robertson told him (and the police) or that he had any reason to doubt her veracity. (See *Morrison v. Rudolph* (2000) 103 Cal.App.4th 506, 512 ["when evaluating a client's case and making an initial assessment of tenability, the attorney is entitled to rely on information provided by the client" unless there is reason to know the client's representations are false], disapproved on other grounds in *Zamos v. Stroud, supra,* 32 Cal.4th 958). At the very least, Mauro's mental state is an additional disputed question of fact contradicting the court of appeal's conclusion that he attempted to extort money from Flatley by threatening to publish "defamatory" matter about the rape to the press.

The tone and style of Mauro's settlement letter, which Flatley characterizes as "resemb[ing] the product of an out-of-control collection agency" because of its use of "giant, boldface letters" (APFR 8), and the fact that Mauro made a "seven figure" demand, also seemingly supported the court of appeal's conclusion that his conduct was "extortion." (See *Flatley v. Mauro, supra,* 121 Cal.App.4th at pp. 1540; Exh. A, p. 20.) However, that Mauro's language may have been coarse or even

unsophisticated does not make him a criminal. And, if Robertson's allegations are true, "seven figures" is far from extortionate. *How much is a rape worth?*

At minimum, all these matters are questions for a jury's determination. They were not, nor should they be, within the province of a court to decide in considering an anti-SLAPP motion. To meet his burden under the first prong of the anti-SLAPP analysis to demonstrate the applicability of the anti-SLAPP statute, Mauro was not required to establish *conclusively* that the settlement demand was a *valid* exercise of free speech or petition rights. Even under *Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th 1356 (on which the court of appeal relied improperly, for the reasons explained in the next section), Mauro simply had to show there was conflicting evidence on this issue. (See *id.* at p. 1367; see also *Navellier v. Sletten* (2002) 29 Cal.4th 82, 94-95; *Governor Gray Davis Committee v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 458-460; *Kashian v. Harriman, supra,* 98 Cal.App.4th at p. 910; *Lieberman v. KCOP Television, Inc., supra,* 110 Cal.App.4th at p. 165; *1-800 Contacts, Inc. v. Steinberg, supra,* 107 Cal.App.4th at p. 583; *Chavez v. Mendoza, supra,* 94 Cal.App.4th at p. 1089; *Fox Searchlight Pictures, Inc. v. Paladino, supra,* 89 Cal.App.4th at p. 305.).) Accordingly, the court of appeal erred in ruling that the settlement demand was an *indisputable* act of criminal extortion.

## II.

### THE COURT OF APPEAL FAILED TO RECOGNIZE THAT EVEN AN "EXTORTIONATE" OR OTHERWISE UNETHICAL SETTLEMENT DEMAND IS WITHIN THE PURVIEW OF THE ANTI-SLAPP STATUTE.

A.   **By Its Plain Terms, The Anti-SLAPP Statute Does Not Require That Litigation-Related Communication Be Lawful Or Satisfy Rules Of Professional Conduct To Qualify As An Act In Furtherance Of The Right To Petition.**

The Legislature enacted the anti-SLAPP statute in response to the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances" (Code Civ. Proc. § 425.16, subd. (a)), which are commonly referred to as "strategic lawsuit[s] against public participation" or SLAPP suits (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1109, fn. 1). SLAPP suits are, by definition, retaliatory suits filed for the purpose of burdening and imposing litigation costs on defendants in order to discourage them from, or punish them for, exercising their rights to speak or petition. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 816, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.) The goal of the anti-SLAPP statute is "to eliminate [such] meritless or retaliatory litigation at an early stage in the proceedings." (*Gallimore v. State Farm Fire & Casualty Ins Co* (2002) 102 Cal.App.4th 1388, 1396.)

Under the anti-SLAPP statute, a defendant may file a special motion to strike causes of action against it that arise from "any act[s] . . . in furtherance of [its] right of petition or free speech under the United States

25

or California Constitution in connection with a public issue." (Code Civ.
Proc., § 425.16, subd. (b)(1).)

Subdivision (e) of the statute defines "act[s] in furtherance of
[the] right of petition or free speech under the United States or California
Constitution in connection with a public issue" as including:

> (1) any written or oral statement or writing made before a
> legislative, executive, or judicial proceeding, or any other
> official proceeding authorized by law; (2) any written or oral
> statement or writing made in connection with an issue under
> consideration or review by a legislative, executive or judicial
> body, or any other official proceeding authorized by law; (3)
> any written or oral statement or writing made in a place open
> to the public or a public forum in connection with an issue of
> public interest; (4) or any other conduct in furtherance of the
> exercise of the constitutional right of petition or the
> constitutional right of free speech in connection with a public
> issue or an issue of public interest.

(Code Civ. Proc., § 425.16, subd. (e).)

"The defendant has the initial burden of making a prima facie
showing that the plaintiff's claims are subject to section 425.16."
(*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) "'[The]
defendant meets this burden by demonstrating that the act underlying the
plaintiff's cause fits one of the categories spelled out in section 425.16,
subdivision (e).'" (*Gallimore v. State Farm Fire & Casualty Ins. Co., supra*,
102 Cal.App.4th at p. 1396, quoting *Braun v. Chronicle Publishing Co.*
(1997) 52 Cal.App.4th 1036, 1043, italics omitted.)

If the defendant establishes that an act which forms the basis for the
complaint fits within one of the four categories enumerated in subdivision
(e), then the motion to strike must be granted unless the plaintiff shows
"there is a probability that the plaintiff will prevail on the claim." (Code
Civ. Proc., § 425.16, subd. (b)(1).)  To make this showing, the plaintiff

LA/590716v1

must present evidence that would be admissible at trial; the plaintiff cannot simply rely on the allegations of the complaint. *(Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 656, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.)

To afford the maximum protection, the Legislature expressly required that the anti-SLAPP statute be construed *broadly.* (Code Civ. Proc., § 425.16, subd. (a); *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 60; *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at pp. 1119, 1121-1122.)

This court has taken that mandate for broad construction to heart, while at the same time "scrupulously honor[ing]" the principle that a court's primary task in construing a statute is to determine the Legislature's intent based, whenever possible, on "'the plain meaning of the actual words of the law . . .'" *(Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.) Time and again, this court has looked to the plain words of the anti-SLAPP statute and refused to impose limitations on its reach that are not expressly stated therein. (See *id.* at pp. 735-736; *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75-76; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131; *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at pp. 1113-1118.)

Thus, this court has held the plain language of the anti-SLAPP statute encompasses *any* action based on protected speech or petitioning activity as defined in the statute *(Navellier v. Sletten, supra,* 29 Cal.4th at pp. 89-95), and has refused to judicially engraft the statute with additional requirements that moving defendants prove the challenged suits were

27

intended to chill their speech (*Equilon Enterprises v. Consumer Cause, Inc.,
supra,* 29 Cal 4th at p. 58) or actually had a chilling effect (*City of Cotati v.
Cashman, supra,* 29 Cal 4th at pp. 75-76).

Most pertinent here, in *Briggs v. Eden Council for Hope &
Opportunity, supra,* 19 Cal. 4th 1106, the court held a defendant moving to
strike a cause of action under clause (e)(1) or (e)(2) of the anti-SLAPP
statute — which protect statements made before or in connection with an
issue under consideration in an official proceeding — need not separately
demonstrate the challenged statement involved an issue of public
significance. (*Id.* at p. 1118.) The court distinguished clauses (e)(3) and
(e)(4) of the statute — which protect First Amendment activity in public
venues that is not necessarily related to any official proceeding — on the
ground that clauses (e)(3) and (e)(4), unlike (e)(1) and (e)(2), explicitly
require a connection to a "public issue or an issue of public interest." (*Id.* at
p. 1112.)

And, in *Navellier v. Sletten, supra,* 29 Cal.4th 82, the court held that,
to satisfy the anti-SLAPP statute's first prong, a defendant need not prove
the activity at issue was constitutionally protected as a matter of law; rather,
"any 'claimed illegitimacy of the defendant's acts is an issue which *the
plaintiff* must raise *and* support in the context of the discharge of the
plaintiff's [secondary] burden to provide a prima facie showing of the
merits of the plaintiff's case.'" (*Id.* at p. 94.)

Consistent with these decisions, it must also be true that a defendant
moving to strike a cause of action arising from litigation-related
communication under clause (e)(1) or (e)(2) does not bear the added burden
of showing the communication was lawful or comports with rules of
professional conduct. Clauses (e)(3) and (e)(4) of the anti-SLAPP statute,

concerning statements made in public fora and "other conduct" implicating speech or petition rights, require that the statement or other conduct at issue be "in furtherance of the exercise of the right of petition or free speech." (Code Civ. Proc., § 425.16, subd. (e)(3), (4).) As was noted in *Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th at pp. 1365-1367, on which the court of appeal here relied, this implies that the statement or conduct cannot be an indisputably unlawful or otherwise invalid exercise of constitutional rights. By contrast, clauses (e)(1) and (e)(2), which concern litigation-related communications (and were not at issue in *Paul for Council*), require only (a) a written or oral statement or writing, (b) made before or in connection with an issue under consideration in an official proceeding. (Code Civ. Proc., § 425.16, subd. (e)(1), (e)(2).) Clauses (e)(1) and (e)(2) impose no additional requirements, such as lawfulness or compliance with rules of professional conduct.

For the reasons explained below, there is good reason that even unlawful or unethical litigation-related communications are within the reach of the anti-SLAPP statute. A contrary rule would create the "anomalous result" this court has previously refused to accept, "that much direct petition activity . . . [,] while absolutely privileged under the litigation privilege . . . and under the federal and state Constitutions, would *not* be entitled to the procedural protections of the anti-SLAPP law, even though section 425.16 expressly states the Legislature's intent thereby 'broadly' to protect the right of petition. . . ." (*Briggs v Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1121.)

Flatley's claims against Mauro in the present case arise from Mauro's litigation-related communications – a settlement demand. Thus, Mauro satisfied his burden to demonstrate the applicability of the anti-

SLAPP statute even if, as the court of appeal wrongly concluded, the settlement demand was extortionate.

**B.    Because The Litigation Privilege Completely Bars Civil Actions Arising From Unlawful Or Unprofessional Litigation-Related Communication, Including Extortion, Such Communication Also Deserves The Anti-SLAPP Statute's More Limited Procedural Protection.**

**1.    The litigation privilege provides absolute immunity from civil liability for litigation-related communication that is unlawful or violates a rule of professional conduct.**

Like the anti-SLAPP statute, the litigation privilege is concerned with protecting the right of petition and ensuring free access to the courts. "[T]he absolute privilege established by section 47(b) serves the important public policy of assuring free access to the courts and other official proceedings. . . . [B]oth the effective administration of justice and the citizen's right of access to the government for redress of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings." (*Hagberg v. California Federal Bank FSB* (2004) 32 Cal. 4th 350, 360; see also *Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 736, fn. 5 [noting, in discussing the anti-SLAPP statute: "Our past pronouncements emphasize that the right of access to courts is an aspect of the First Amendment right of petition"]; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 647 [same], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 68.) Indeed, "the litigation privilege[] has been referred to as 'the backbone to an effective and smoothly operating judicial system.'" (*Silberg v. Anderson, supra*, 50 Cal.3d at p. 215).

To adequately safeguard the right to petition, the litigation privilege, like the anti-SLAPP statute, has been applied broadly. Typically, the

privilege attaches to any communication "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 212).

However, the litigation privilege is not limited to statements made in a courtroom. It encompasses "'statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit.'" (*Hagberg v. California Federal Bank FSB, supra,* 32 Cal.4th at p. 361; see also *Rubin v. Green* (1993) 4 Cal.4th 1187, 1194; *PG & E v. Bear Stearns* (1990) 50 Cal.3d 1118, 1132-1133, 1137; compare *Dove Audio, Inc. v. Rosenfeld, Meyer & Sussman* (1996) 47 Cal.App.4th 777, 784 [noting that the anti-SLAPP statute similarly applies to pre-litigation communication].)

Statements made in pre-litigation settlement demands or during settlement negotiations, both before or during litigation, are covered by the litigation privilege (see, e.g. *Knoell v. Petrovich* (1999) 76 Cal.App.4th 164 *Lerette v. Dean Witter Organization, Inc., supra,* 60 Cal.App.3d 573; *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254; *Larmour v. Campanelle, supra,* 96 Cal.App.3d 566; *Asia Investments Co., Ltd. v. Borowski, supra,* 133 Cal.App.3d 832), just as such statements are protected by the anti-SLAPP statute (see, e.g., *Dowling v. Zimmerman* (2001) 85 Cal.App. 4th 1400, 1420).

The litigation privilege absolutely protects even litigation-related communications that are *indisputably unlawful.* (See, e.g., *Hagberg v California Federal Bank FSB, supra,* 32 Cal. 4th at p. 371 [falsely reporting a crime to police]; *Pettitt v. Levy* (1972) 28 Cal.App.3d 484 [preparing and

presenting false documents in court]; *Kachig v Boothe* (1971) 22 Cal.App.3d 626 [committing perjury]; *Doctors' Company Ins. v Superior Court* (1990) 225 Cal.App. 3d 1284 [suborning perjury]; *Carden v Getzoff* (1987) 190 Cal App. 3d 907 [manufacturing false evidence]; *Steiner v. Eikerling* (1986) 181 Cal.App 3d 639 [preparing and offering a forged will for probate]; *Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App 4th 17 [misrepresenting available insurance policy limits to induce settlement]; *O'Neil v. Cunningham* (1981) 118 Cal.App.3d 466 [defaming a client during the course of judicial proceedings].)

This court has recognized that application of the privilege to unlawful conduct "necessarily results in some real injuries that go uncompensated. But . . . that is the 'price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say'" (*Silberg v Anderson, supra,* 50 Cal.3d at p. 218) and for attorneys who are sufficiently uninhibited in representing their clients to make the right of petition meaningful (*Lerette v. Dean Witter Organization, Inc., supra,* 60 Cal.App.3d at p. 577). "The salutary policy reasons for an absolute privilege supersede individual litigants' interests in recovering damages for injurious publications made during the course of judicial proceedings." (*Silberg v. Anderson, supra,* 50 Cal.3d at p 218.) The absolute litigation privilege exists "'not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with [subsequent derivative] actions . . .'" such that he/she fails to realize for his client the promise of free access to the courts. (*Id.* at p 214.) "[T]h[is] evil[] inherent in permitting derivative tort actions based on communications during the trial of a previous action [is] . . . far more destructive to the administration of justice than an occasional 'unfair' result." (*Id.* at p. 213.)

LA/590716v1

Moreover, in most cases, there are other remedies available, including criminal prosecution and State Bar disciplinary proceedings (*Silberg v. Anderson, supra,* 50 Cal.3d at pp. 218-219; *Hagberg v. California Federal Bank FSB, supra,* 32 Cal. 4th at p. 371; see also *Budwin v. American Psychological Association* (1994) 24 Cal.App.4th 875 [litigation privilege did not prevent private psychologists' association from disciplining psychologist-member for making false representations in child custody case].)

### 2.    There is no exception taking extortion, but not other kinds of unlawful litigation-related communication, outside the scope of the litigation privilege.

Unable to refute the clear authority establishing the litigation privilege provides absolute immunity from liability for *all kinds* of litigation-related communications, *including unlawful communications such as perjury, suborning perjury, and fraud,* Flatley argues there is some kind of exception for extortion, and that Mauro conceded this below. (APFR, pp. 22-24.) This argument is simply wrong on both counts.

First, Mauro made no such concession. He demurred to Flatley's complaint on the ground that the litigation privilege immunizes his settlement demand, which the complaint alleged was, and for purposes of Mauro's demurrer was presumed to be, extortionate. (CT 58-72.) Mauro also moved to strike the complaint under the anti-SLAPP statute, arguing Flatley could not establish a probability of success on the merits of his claims because the demand is absolutely protected by the litigation privilege. (CT 416-417.) Although Mauro contended the settlement demand was not extortionate, he also argued that, even if it was, the litigation privilege applies and bars Flatley's action.

33

Flatley offers no reasoned explanation why the litigation privilege should protect all unlawful litigation-related communications *except* "extortion." Fraud and perjury subvert the function of the judicial process just as surely as extortion. Thus, *Blanchard v DIRECTV* (2004) 123 Cal.App.4th 903, rejected the very same argument Flatley advances here— i.e., that the litigation privilege does not apply to pre-litigation settlement demand letters that are "extortionate" and intended to "coerce" settlement. (*Id.* at p. 921.) The *Blanchard* court observed: "demand letters directed toward settlement of anticipated lawsuits are 'in furtherance of litigation' and thus protected [by the privilege]. More important, 'communications made in connection with litigation do not necessarily fall outside the privilege merely because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal' assuming they are logically related to litigation." (*Ibid*, quoting *Kashian v Harriman, supra,* 98 Cal.App.4th 892; see also *Knoell v. Petrovich, supra,* 76 Cal.App.4th 164, 171["Appellant cannot plead around the litigation privilege based on the theory that the defamatory statements [made in a demand letter to appellant and a subsequent letter to the district attorney] were fraudulently published to coerce a settlement."].)

Contrary to Flatley's contention, *Nguyen v. Proton Technology. Corp.* (1999) 69 Cal.App.4th 140, *Carney v Rotkin, Schmerin & McIntyre* (1988) 206 Cal.App.3d 1513, and *Kinnamon v. Staitman & Snyder* (1977) 66 Cal.App.3d 893, do not support a contrary conclusion that extortion is exempt from the scope of the litigation privilege.

*Nguyen* involved a settlement demand letter that included erroneous references to a third party's criminal record, not threats of criminal prosecution or to report a crime to the press. (*Nguyen v. Proton*

LA/590716v1

*Technology. Corp , supra,* 69 Cal App.4th at pp. 143-146.) The court held the litigation privilege inapplicable not because the demand letter was extortionate, but because there was no "logical connection" between the criminal record and the dispute alleged in the demand letter. (*Id* at pp 142-143,149-153.) The statement about the criminal record was entirely extraneous to the threatened legal action and, for *that* reason, did not merit the protection of the litigation privilege. (*Id.* at pp. 151-152; see also *Sacramento Brewing Co , Inc , Plaintiff v. Desmond, Miller & Desmond* (2005) 75 Cal.App 4th 1082, 1091 [discussing this aspect of *Nguyen*].)

Although in *Kinnamon* and *Carney* the litigation privilege was held inapplicable to actual threats of criminal prosecution made in settlement demands, both cases have been disapproved more than once and are of questionable precedential value. (See *Silberg v. Anderson, supra,* 50 Cal.3d at p. 212; *Ross v. Creel Printing & Publishing Co.* (2002) 100 Cal.App.4th 736, 746-747; *Kashian v Harriman, supra,* 98 Cal.App.4th at pp. 917-918.)

In reaching their conclusions, the courts in both *Kinnamon* and *Carney* implicitly relied on the "interest of justice" test that this court later rejected in *Silberg v. Anderson, supra,* 50 Cal.3d 205. (See *Carney v. Rotkin, Schmerin & McIntyre, supra,* 206 Cal.App.3d at pp. 1522-1523; *Kinnamon v. Staitman & Snyder, supra,* 66 Cal App.3d at p. 897; see also *Kashian v Harriman, supra,* 98 Cal.App.4th at pp. 917-920 [rejecting *Kinnamon* and *Carney* because of their reliance on the "interest of justice" test].) That test originated in *Bradley v. Hartford Acc. & Indem. Co.* (1973) 30 Cal App.3d 818, which stated: "[In] determining whether or not the defamatory publication should be accorded an absolute privilege, special emphasis must be laid on the requirement that it be made in furtherance of the litigation to promote the interest of justice." (*Id.* at p. 826.)

In *Silberg*, this court disagreed, holding: "A rule that an otherwise privileged communication is not privileged under section 47(2) [now section 47, subdivision (b)] unless made for the purpose of promoting the 'interest of justice' is wholly inconsistent with the numerous cases in which fraudulent communications or perjured testimony have nevertheless been held privileged.'" (*Silberg v Anderson, supra,* 50 Cal 3d at p. 218.) As the *Silberg* court further explained, the "requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the requirement that the communication be connected with, or have some logical relation to, the action, i e., that it not be extraneous to the action. . . . The 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent." (*Id* at pp. 219, 220.)

A settlement demand, even an indisputably extortionate settlement demand, obviously is connected with and has a logical relation to the threatened action. (*Blanchard v. DIRECTV, supra,* 123 Cal.App.4th at p. 921; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1148 ["furtherance" requirement "is satisfied by demand letters . . . which are directed toward settlement of a pending or anticipated lawsuit"].) Thus, contrary to the holdings in *Kinnamon* and *Carney,* even an indisputably extortionate settlement demand is subject to the litigation privilege. And, contrary to Flatley's contention here, the litigation privilege completely immunizes Mauro from every one of Flatley's claims arising from Mauro's pre-litigation settlement demand, even assuming — as Flatley *contends* but Mauro vigorously disputes — the settlement demand was "extortionate."

36

3.  **As this court has correctly observed, the anti-SLAPP statute is at least as broad, if not broader, than the litigation privilege.**

This court has already recognized that the scope of protected petitioning activity is, necessarily, at least as broad under the anti-SLAPP statute as under the litigation privilege. Several times, this court has "declined to construe the anti-SLAPP statute so as to produce 'the anomalous result that much direct petition activity . . . [,] while absolutely privileged under the litigation privilege . . . and under the federal and state Constitutions, would *not* be entitled to the procedural protection of the anti-SLAPP law, even though section 425.16 expressly states the Legislature's intent thereby 'broadly' to protect the right of petition.'" (*Briggs v. Eden Council for Hope & Opportunity, supra*, 19 Cal.4th at p. 1121; *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at pp. 64-65; *City of Cotati v. Cashman, supra*, 29 Cal.4th at p. 76.)

The courts of appeal have, for the most part, heeded this court's message and equated the scope of the anti-SLAPP statute with the litigation privilege. (See *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1057-1059 [holding attorney's fraudulent communications in connection with litigation were protected by anti-SLAPP statute to same extent as by litigation privilege]; *Dove Audio, Inc. v. Rosenfeld, Meyer & Sussman, supra*, 47 Cal.App.4th at p. 784 ["Just as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege . . ., we hold that such statements are equally entitled to the benefits of section 425.16"]; see also *Dickens v. Provident Life and Accident Insurance Co.* (2004) 117 Cal.App.4th 705, 715; *Wang v. Hartunian* (2003) 111 Cal.App.4th 744, 748-749; *Kashian v. Harriman,*

*supra*, 98 Cal App.4th at pp. 915; *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 19.)

At least implicitly, this court also has indicated that the anti-SLAPP statute actually is *broader* in its coverage than the litigation privilege. For example, in *Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th 728, this court held that malicious prosecution claims — the only claims exempt from the litigation privilege — are nonetheless subject to the anti-SLAPP statute. (*Id.* at pp. 736-737.) As this court stated in *Jarrow*: "The litigation privilege is an entirely different type of statute than section 425.16. The former enshrines a substantive rule of law that grants absolute immunity from tort liability for communications made in relation to judicial proceedings [citations]; the latter is a procedural device for screening out meritless claims [citations]. Unlike the 'absolute bar to relief created by the litigation privilege[,]' . . . [t]he anti-SLAPP statute 'does not bar a plaintiff from litigating an action that arises out of the defendant's free speech or petitioning' [citation]; rather, 'it subjects to potential dismissal only those actions in which the plaintiff cannot 'state[ ] and substantiate[ ] a legally sufficient claim.''" (*Id.* at pp. 737-738.)

Thus, even litigation-related communications falling *outside* the litigation privilege's protection may still be acts in furtherance of the exercise of the right of petition for purposes of the anti-SLAPP statute. "The [litigation] privilege informs interpretation of the 'arising from' prong of the anti-SLAPP statute . . ., but protections afforded by the statute and the privilege are not entirely coextensive." (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 770.)

In this case, however, the court need not decide the extent to which the anti-SLAPP statute is broader than the litigation privilege. Here, the

38

court is asked to address a simpler question: whether litigation-related communication that falls *within* the litigation privilege's absolute protection — even though it is, for the sake of argument, assumed to be unlawful or unethical — can be denied the more limited, purely procedural protection of the anti-SLAPP statute when nothing in the language of the anti-SLAPP statute suggests the Legislature intended such an "anomalous" result. The answer is clearly "No." Otherwise, "much direct petition activity . . . [,] while absolutely privileged under the litigation privilege . . . and under the federal and state Constitutions, would *not* be entitled to the procedural protections of the anti-SLAPP law, even though section 425.16 expressly states the Legislature's intent thereby 'broadly' to protect the right of petition.'" (*Briggs v Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1121.)

### 4.    Lower courts have applied the anti-SLAPP statute to "extortionate" settlement demands.

Applying the broad construction of the anti-SLAPP statute mandated by the Legislature and this court's prior decisions construing the scope of the statute in reference to the litigation privilege, the courts of appeal have recognized that causes of action based on settlement demands no different from Mauro's are subject to an anti-SLAPP special motion to strike.

In *Blanchard v. DIRECTV, supra,* 123 Cal.App.4th 903 for example, DIRECTV sent demand letters to thousands of people who purchased devices that can pirate DIRECTV's television programming. (*Id.* at pp. 909-910.) In its demand letters, DIRECTV explained that use of the devices to gain access to DIRECTV's programming violated federal law; offered an opportunity for settlement; "repeatedly implie[d] that, unless the recipient settled, DIRECTV would seek monetary damages and 'the recipient could

face civil and criminal prosecution'"; and included "'[a] list of demands which ... must be met in timely fashion' or DIRECTV threatened to "'initiate legal proceedings [,]'" and "'abandon its attempts to negotiate.'" (*Id.* at p. 110.)

Plaintiffs, recipients of DIRECTV's demand letters, sued DIRECTV, alleging the demand letters were an unfair business practice (Bus. & Prof.Code, § 17200 (the UCL)), violated their civil rights and, most pertinently here, constituted *extortion. (Blanchard v. DIRECTV, Inc., supra,* 123 Cal.App.4th at p. 910.)   In their complaint, plaintiffs alleged: "DIRECTV sent demand letters to every name found on customer lists without first ascertaining whether the letter recipients actually possessed the hardware and used it in some improper fashion. *The purpose of the demand letters was to intimidate and coerce the recipients into forfeiting the equipment and to extort money.*" (*Ibid.,* emphasis added.)

DIRECTV filed an anti-SLAPP motion to strike, asserting (1) the complaint arose from its demand letters, which were sent in anticipation of litigation and thus constituted an exercise of its right to petition, and (2) plaintiffs could not show a reasonable probability of success on their claims because the demand letters were immune from liability under the litigation privilege. (*Blanchard v. DIRECTV, Inc., supra,* 123 Cal.App.4th at p. 911.) The trial court granted DIRECTV's motion. (*Id.* at p. 912.)

The court of appeal affirmed, observing: "[P]laintiffs cannot successfully argue that their complaint does not arise from DIRECTV's constitutionally protected right to petition for redress of grievances. The entire lawsuit is premised on DIRECTV's demand letter, sent in advance of, or to avoid, litigation to vindicate its right not to have its programming pirated." (*Blanchard v. DIRECTV, Inc., supra,* 123 Cal.App.4th at p. 918.)

In other words, *Blanchard* held that a pre-litigation settlement demand letter threatening that unless the recipient settles, civil *and criminal proceedings will be initiated* against the recipient, *is* an exercise of the right to petition within the meaning of the anti-SLAPP statute and subject to the statute's protection. (See also *Shekhter v Financial Indemnity Co., supra,* 89 Cal.App.4th at p 153 [applying anti-SLAPP statute to causes of action based on conduct that included "using media access so as to extort settlement of meritless claims"].)

By contrast, the court of appeal in the present case concluded a pre-litigation settlement demand that merely mentioned evidence of unknown crimes that *might* be revealed in discovery would be reported to appropriate authorities, *is not* an exercise of the right to petition and, therefore, *not* within the protection of the anti-SLAPP statute. Even if, as the court of appeal wrongly stated, Mauro's settlement demand letter threatened to report Robertson's *rape* to police, the holding here directly conflicts with *Blanchard*, with this court's previous decisions, and with the Legislature's explicit mandate for a broad construction of the anti-SLAPP statute.

In sum, Mauro's settlement demand was litigation-related activity subject to the anti-SLAPP statute whether the demand was "extortionate" or not. Flatley could not prevail on any of his claims against Mauro because the litigation privilege completely shields Mauro from liability arising out of the settlement demand even if the demand amounted to unlawful extortion (which it did not). Therefore, Mauro's special motion to strike should have been granted.

## CONCLUSION

For the foregoing reasons, the court of appeal erred in finding the anti-SLAPP statute inapplicable to Flatley's claims against Mauro and affirming the denial of the motion. Contrary to the court of appeal's decision, Mauro's settlement demand was not *indisputably* extortionate. Even if it was, the anti-SLAPP statute still applied. Thus, the burden shifted to Flatley to demonstrate a probability of prevailing on the merits of his claims. Flatley could not meet that burden because the litigation privilege completely immunizes Mauro's conduct, whether the conduct was extortionate or not. Accordingly, Mauro's special motion to strike should have been granted.

DATED: February 14, 2005      **SEDGWICK, DETERT, MORAN**
                                       **& ARNOLD LLP**
                                       James J.S. Holmes
                                       Christina J. Imre
                                       Douglas J. Collodel
                                       Orly Degani

By: _____
                          Orly Degani
           Attorneys for Defendant and Appellant,
                 **D. DEAN MAURO**

LA/590716v1

## CERTIFICATE OF WORD COUNT

The attached Opening Brief on the Merits was produced on a computer, using the word processing program WordXP. The Font is 13-point Times New Roman.

According to the word count feature of the program, this document contains 11,298 words, including footnotes, but not including the table of contents, table of authorities, and this certification.

DATED: February 14, 2005

Orly Degani

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Sedgwick, Detert, Moran & Arnold LLP, 801 South Figueroa Street, 18th Floor, Los Angeles, California 90017-5556. On February 14, 2005, I served the within document(s):

### OPENING BRIEF ON THE MERITS

☒   MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

Court of Appeal, Second Appellate District
Division 5, B171570
Ronald Reagan Building
300 S. Spring Street, 2nd Floor - North Tower
Los Angeles, California 90013-1233

Bertram Fields, Esq.
GREENBERG, GLUSKER, FIELDS, CLAMAN,
MACHTINGER & KINSELLA, L.L.P.
1900 Avenue of the Stars, Suite 2100
Los Angeles, California 90067-4590
(310) 553-3610 / 310) 553-0687 Fax
**Attorneys for Plaintiff and Respondent**
**Michael Flatley**

Kenneth K. Yoo
Law Offices of Kenneth K. Yoo
3660 Wilshire Blvd., # 1104
Los Angeles, CA 90010
(213) 387-7100 / (213) 387-7101 Fax
**Attorney for Defendant**
**Tyna Marie Robertson**

Clerk, Los Angeles Superior Court
LASC Case No. BC291551
Central District
111 N. Hill Street
Los Angeles, CA 90012-3014

**Courtesy Copy:**
LASC Case No. BC291551
Hon. Richard C. Hubbell, Dept. 62
Los Angeles Superior Court
111 N. Hill Street
Los Angeles, CA 90012-3014

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 14, 2005 at Los Angeles, California.

_____
Betty J. Thomas