Steven F. Schossberger, California Bar No. 178494
D. John Ashby, ISB No. 7228 *(Admitted Pro Hac Vice)*
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5260

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOYT A. FLEMING,<br><br>            Plaintiff,<br>vs.<br><br>TOM COVERSTONE,<br><br>            Defendant. | Case No. 03:08 CV 355 WQH-NLS<br><br>PLAINTIFF'S TRIAL BRIEF<br><br>Judge: William Q. Hayes<br>Magistrate Judge: Nita L. Stormes<br>Complaint Filed: February 22, 2008<br>Trial Date: January 25, 2011 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................. 1

III. CLAIM FOR BREACH OF CONTRACT ...................................................... 5

    A.    Elements Of A Contract Under Cal. Civ. Code § 1550. ..................... 5

        1.    Parties Capable of Contracting ............................................... 5

        2.    Mutual Consent. ....................................................................... 6

        3.    Lawful Object. .......................................................................... 7

        4.    Sufficient Consideration. .......................................................... 8

    B.    FLEMING'S RECOVERY FOR BREACH OF CONTRACT DAMAGES. ................................................................................................ 9

    C.    MEASURE OF FLEMING'S DAMAGES. ........................................... 9

IV. CONCLUSION ................................................................................................ 10

- i -

TABLE OF CONTENTS

3:08 CV 355 WQH-NLS

44015.0001.2156035.1

## I.

## INTRODUCTION

This Trial Brief is submitted on behalf of Plaintiff Hoyt Fleming ("Fleming"). The operative pleadings in this case are the Third Amended Complaint ("TAC") (ECF No. 84), and Defendant Tom Coverstone's ("Coverstone") Answer to Plaintiff's Third Amended Complaint (ECF NO. 86).[1] At trial Fleming seeks damages in the amount of $890,000, plus interest, due to Coverstone's breach of the contract for the sale of Fleming's patent portfolio to Coverstone.

## II.

## FACTUAL BACKGROUND

On January 9, 2008, Fleming and Coverstone, both licensed United States patent attorneys, met in Las Vegas, Nevada to discuss Coverstone's purchase of Fleming's patent portfolio. During that meeting, Mr. Michael Dowler introduced Fleming and Coverstone. Mr. Dowler stated, in the presence of both Fleming and Coverstone, that Coverstone was interested in purchasing patents and that Fleming was interested in selling his patents.

On January 22, 2008, Fleming received a phone call from a patent broker. During that phone call, the broker expressed a significant interest in purchasing Fleming's patent portfolio. Fleming told the patent broker that Fleming was already negotiating with someone else and that Fleming was going to give that person the first opportunity to decide if he wanted to purchase Fleming's patent portfolio.

On January 22, 2008, Fleming called Coverstone and told him about Fleming's conversation with the patent broker. Coverstone then orally agreed to purchase Fleming's patent portfolio for $1,000,000.00. In confirmation of the oral agreement, Fleming sent Coverstone an email entitled "Purchase of Fleming Radar Detector Family." The email stated, in relevant part:

---

[1] Coverstone's counterclaims have all been dismissed by the Court.

- 1 -

"Tom,

This email confirms that I have agreed to sell and that you have agreed to purchase U.S. Patent No. 6,204,798, which has been reissued, Reissue Patent No. 039,038, Patent Application No. U.S. Patent No. 11/196,841, and Patent Application No. 11/924,352. The purchase price for the above patents and applications is one million dollars.

You and I will strive to close the sale by February 1, 2008. However, you and I will close the sale by February 15, 2008.

Both you and I understand that I will assign a 10% interest in the above patents and applications to Vineyard Boise, a church in Boise, Idaho, and that Vineyard Boise will then assign its 10% interest to you, or an entity that you designate. I will assign my 90% interest directly to you or an entity that you designate. You will then immediately pay me $900,000 and you will then immediately pay Vineyard Boise $100,000.

You and I agree that you and/or your attorneys will draft the necessary agreements.

You agree to wire me ten thousand dollars tomorrow as a deposit on the purchase price. This deposit will not be refunded if the above sale is not completed by February 15, 2008. I agree to work with you and your attorneys to close the sale by February 15, 2008.

. . .

If you agree to the above, then please confirm via email.

Thank you.

Hoyt Fleming"

Exhibit 1.

Later that day, Coverstone responded to the email confirming his agreement to the terms:

"Hoyt,

Agreed.

I will wire the $10,000.00 tomorrow to your account.

As we discussed on the phone just now, your wife Teresa will sign the assignment documents or whatever is needed. I am tied up this week, let's talk next Monday morning.

Best Regards,

Tom"

Exhibit 2.

On January 23, 2008, in conformance with the terms of their purchase contract, Coverstone wired $10,000 to Fleming's account. Exhibit 3.

Thereafter, Fleming informed the patent broker that another person had agreed to purchase Fleming's patent portfolio and that the portfolio was no longer for sale. Fleming would not have informed the patent broker that Fleming's patent portfolio was no longer for sale if Coverstone had not agreed to purchase that portfolio on January 22, 2008.

After January 22, 2008, Coverstone told Fleming to stop all efforts at the U.S. Patent Office to obtain additional patents in the Fleming portfolio until Coverstone authorized future prosecution efforts. Because Coverstone had agreed to purchase Fleming's patent portfolio, Fleming complied. Fleming would not have complied with Coverstone's request to stop all prosecution efforts unless Coverstone had agreed to purchase his portfolio on January 22, 2008.

In late January of 2008, Fleming spoke with Mr. Jim Boyd. Mr. Boyd is the Treasurer and Chairman of the Finance Board for the Vineyard Boise church. During that conversation, Fleming told Mr. Boyd that a gentleman from California had agreed to purchase his patent portfolio and that Fleming would like to assign 10% of his patent portfolio to the Vineyard Boise church. Fleming told Mr. Boyd, that after receiving the 10% interest, then Fleming would like the Vineyard Boise church to assign its 10% interest to the gentlemen from California in exchange for $100,000. During that conversation, Fleming asked Mr. Boyd if the Vineyard Boise church would be interested in receiving the 10% interest and then assigning the 10% interest in exchange for $100,000. Mr. Boyd replied that the Vineyard Boise church often does similar things with IBM and HP stock and that the Vineyard Boise church would be happy to cooperate. Next, Fleming inquired as to whom at the Vineyard Boise church would execute the two assignment documents. Mr. Boyd replied that both Mr. Boyd and the senior pastor of the Vineyard Boise church would sign the assignment documents.

After Fleming's conversation with Mr. Boyd, Fleming told Coverstone that the assignment documents for the Vineyard Boise church should include signature blocks for both the Chairman of

- 3 -

PLAINTIFF'S TRIAL BRIEF

3:08 CV 355 WQH-NLS

44015.0001.2156035.1

the finance committee and the senior pastor. On February 1, 2008, Coverstone sent an email to his accountant confirming the need to have such signature blocks:

> "He is going to have all the paperwork signed and sent to me, with the paperwork signed by the pastor and the chairman of the finance committee, which is who will sign the documents that receive the 10%."

Exhibit 26.

Between January 22, 2008 and February 15, 2008, Coverstone attempted to sell Fleming's patent portfolio to another entity, Escort Inc. Specifically, Coverstone told an Escort attorney that, "I held an interest in the Fleming patents and wanted to see if there was any interest [i]n Escort purchasing the portfolio." Coverstone made the above statement because, according to Coverstone, Coverstone was "going to flip them [Fleming's patent portfolio] and make money." Escort declined Coverstone's offer to sell the Fleming patent portfolio to Escort. Realizing that he could not "flip" the Fleming patent portfolio for a "quick buck", Coverstone breached his contract with Fleming to buy the portfolio.

On February 11, 2008, Coverstone informed Hank Petri, his attorney working on the assignment documents to "hold off doing any work on this matter." Exhibit 34. On February 13, 2008, Fleming informed Coverstone that he is still willing to meet each and every term in the January 22, 2008 agreement and that he will not extend the closing deadline. Exhibit 35. Coverstone responded by denying that they had a binding agreement for the purchase, and tried to negotiate a new purchase price. Exhibit 35. On February 15, 2008, Coverstone failed to purchase Fleming's patent portfolio pursuant to the terms of the January 22, 2008 written contract.

On February 19, 2008, in an attempt to immediately mitigate his damages after Coverstone's breach, Fleming informed the patent broker that the sale of his patent portfolio did not close as planned, and that he could now freely negotiate the sale of the portfolio. On January 20, 2008, the patent broker stated: "Unfortunately the landscape has shifted somewhat -- such there was no longer a pressing interest in the patent. That may change and I will inform you should that occur." Exhibit 39.

Fleming still owns his patent portfolio. While Fleming believes that the patent portfolio has value, he has been unable to sell it in an unavailable market. After February 15, 2008, Fleming's patent portfolio has been unmarketable due to what resulted from the actions of Coverstone.

On April 2, 2008, Coverstone, through his companies, filed Plaintiff's Original Petition with the District Court in Harris County, Texas. Exhibit 45. The petition contains the statement, "Coverstone on behalf of Guardian thereafter made his own inquiry as to the . . . value of the patent, unfortunately learning that the patent . . . actually had little to no value." Exhibit 45.

On April 21, 2008 a copy of the petition was published world-wide on www.law.com, along with an article that also contained the "little to no value" statement, and that "Coverstone then backed out of the deal." Exhibit 46. The filing of the petition, and world-wide publications on www.law.com destroyed an available market within which to resell Fleming's patent portfolio. Consequently, Fleming has been damaged in the amount of $890,000, plus interest.

## III.

## CLAIM FOR BREACH OF CONTRACT

A. **Elements Of A Contract Under Cal. Civ. Code § 1550.**

Under California law, the four essential elements of a valid contract are:

1. Parties capable of contracting;
2. Their consent;
3. A lawful object; and
4. A sufficient cause or consideration.

Cal. Civ. Code § 1550; *United States ex rel Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. Cal. 1999), cert. denied 120 S. Ct. 2657, 530 U.S. 1228, 147 L.Ed.2d 272; *Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F.Supp.2d 1184 (C.D. Cal. 2007); *Netbula, LLC v. BindView Development Corp.*, 516 F.Supp.2d 1137 (N.D. Cal. 2007). "When a contract is reduced to a writing, the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* § 1639.

1. **Parties Capable of Contracting**.

The January 22, 2008 written contract identifies two parties. It states:

> "<u>Tom</u>,
>
> This email confirms that I have agreed to sell and that you have agreed to purchase . . .
>
> <u>Hoyt Fleming</u>"

and

> "<u>Hoyt</u>,
>
> Agreed.
>
> . . .
>
> Best Regards,
>
> <u>Tom</u>"

Exhibits 1 and 2.

Because the January 22, 2008 written contract is clear and unambiguous, the intentions of the parties should be ascertained from the written language and not from any extrinsic evidence. *See* CAL. CIV. CODE § 1639. As the Court has already held, Fleming and Coverstone are the parties to the January 22, 2008 written contract:

> "The January 22 Email Exchange contemplates that Plaintiff would sell and Defendant would purchase specified patents, and does not indicate that Defendant was not negotiating on his behalf, or that parties other than Plaintiff and Defendant would be bound by the agreement."

(ECS No. 47, at 11).

Thus, there are two and only two parties to the January 22, 2008 written contract, Fleming and Coverstone.

2.  **Mutual Consent.**

The January 22, 2008 written contract evidences the consent of both Fleming and Coverstone. It states:

> "Tom,
>
> This email confirms that <u>I have agreed</u> to sell and that <u>you have agreed</u> to purchase . . .

> <u>You and I agree</u> that you and/or your attorneys will draft the necessary agreements.
>
> <u>You agree</u> to wire me ten thousand dollars tomorrow as a deposit on the purchase price. This deposit will not be refunded if the above sale is not completed by February 15, 2008. <u>I agree</u> to work with you and your attorneys to close the sale by February 15, 2008.
>
> . . .
>
> <u>If you agree to the above, then please confirm via email</u>.
>
> Hoyt Fleming

and

> "Hoyt,
>
> <u>Agreed</u>.
>
> . . . .
>
> Best Regards,
>
> Tom"

Exhibits 1 and 2.

The Court previously stated that both Fleming and Coverstone "unequivocally" manifested their consent:

> "Plaintiff's January 22, 2008 email requested Defendant to confirm '[i]f you agree to the above,' and Defendant responded unequivocally: 'Agreed.'"

(ECF No. 47, at 11).

### 3. **Lawful Object.**

The January 22, 2008 written contract has a lawful objective, namely to sell Fleming's patent portfolio to Coverstone for one million dollars.

> "This email confirms that I have agreed to sell and that you have agreed to purchase U.S. Patent No. 6,204,798, which has been reissued, Reissue Patent No. 039,038, Patent Application No. U.S. Patent No. 11/196,841, and Patent Application No. 11/924,352. The purchase price for the above patents and applications is one million dollars."

- 7 -

PLAINTIFF'S TRIAL BRIEF

3:08 CV 355 WQH-NLS

44015.0001.2156035.1

Exhibit 1.

California statutes require that a contract have "a lawful object." CIV. CODE § 1550, subd. (3); see CIV. CODE § 1596. Otherwise the contract is void. CIV. CODE § 1598. CIV. CODE § 1668 provides that, "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against public policy of the law." CIV. CODE § 1667 states that "unlawful" is "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals." See also CIV. CODE § 1441 ("a condition in a contract, the fulfillment of which is . . . unlawful . . . is void"), and CIV. CODE § 1608 ("if any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void."). However, it is true that "[a]s a general rule, if a contract can be performed legally, a court will presume that the parties intended a lawful mode of performance." *Redke v. Silvertrust*, 6 Cal.3d 94, 102, 98 Cal.Rptr. 293, 490 P. 2d 805 (1971); see *West Covina Enterprises, Inc. v. Chalmers*, 49 Cal.2d 754, 759, 322 P.2d 13 (1958). There is no California or Federal law that prohibits selling or purchasing patents and patent applications. The January 22, 2008 written contract can be performed legally. Therefore this Court must presume that the parties intended a lawful mode of performance. *Redke, supra*, 6 Cal.3d at 102. Thus, the January 22, 2008 written contract has a lawful objective.

### 4. **Sufficient Consideration.**

The January 22, 2008 written contract demonstrates sufficient consideration, namely mutual promises. Fleming promised to sell his patent portfolio in exchange for Coverstone promising to pay $1,000,000. Mutual promises are sufficient consideration. *See* CAL. CIV. CODE § 1605; *Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.*, 160 Cal.App.2d 290, 295 (Cal. App. 1958) ("Mutual promises constitute consideration."); *Stewart v. Preston Pipeline Inc.*, 36 Cal.Rptr.3d 901, 918 (Cal. App. 2005) ("mutual promises (sufficient consideration)").

B. **FLEMING'S RECOVERY FOR BREACH OF CONTRACT DAMAGES.**

The evidence shows that Fleming and Coverstone entered into a written contract. The evidence will further shows that Fleming was excused from doing the significant things that the written contract required him to do due to Coverstone's repudiation of the January 22, 2008 contract. Exhibits 34, 35 and 36; (CACI 324 Anticipatory Breach). Fleming still informed Coverstone that he was ready, willing and able to perform each and every term required of him under the January 22, 2008 written contract on or before February 15, 2008. Exhibit 35; (CACI 324 Anticipatory Breach). On February 15, 2008, Coverstone failed to purchase Fleming's patent portfolio pursuant to the terms of the January 22, 2008 written contract. Fleming was harmed by that failure. (CACI 303 Breach of Contract).

C. **MEASURE OF FLEMING'S DAMAGES.**

The proper standard to measure Fleming's damages is to calculate the seller damage offset as provided in California Civil Code § 3353, as follows:

> "**Value, how estimated in favor of seller**. In estimating damages, the value of property to a seller thereof is deemed to be the price which he could have obtained therefor in the market nearest to the place at which it should have been accepted by the buyer, and at such time after the breach of the contract as would have sufficed, with reasonable diligence, for the seller to effect a resale."

See *Sackett v. Spindler*, 248 Cal.App.2d 220 (Ct. App. 1st Dist. 1967). The *Sacket* case is controlling authority as to how a court is to determine the seller damage offset of a seller's personal property.

> "As used in this measure, the words "market price" and "market value" mean the same thing, that is, the price or value of the article as established or shown by sales in the way of ordinary business; the price at which goods are freely offered in the market to all the world. . . . **The above-stated measure of damages, however, does not ordinarily apply when there is no market available at the time and place of performance**. In such cases resort may be had to the market value of the goods at the nearest available market; and **in the absence of an available market, it has been held that the measure of damages may be the difference between the contract price and the value of the goods as best as can be ascertained, or the difference between the contract price and the best offer that can be obtained for the goods, or the difference between the contract price and the price obtained on a resale, or the actual damages naturally and directly resulting from the buyer's breach**." *Id.* at 236.

As is evident from California Civil Code § 3353 and *Sackett v. Spindler*, "the value of property to a seller" or "market value", that is offset from the contract price when determining damages to a seller is the "price which he could have obtained therefore in the market", the "value of the article as established or shown by sales" or the "best offer that can be obtained for the goods" <u>at the time of the breach</u>. Only evidence, such as the price that a seller could have obtained, comparable sales, and offers to purchase are to be used to determine the seller damage offset. *Id.* However, the evidence will show that after the filing and publications of the Texas suit there was an unavailable market to sell Fleming's patent portfolio. Consequently, any further attempts by Fleming to market the patent portfolio would have been futile, and Fleming's decisions to mitigate his damages following Coverstone's breach were reasonable. (CACI 358). Therefore, because there was no available market due to this special circumstance, the measure of damages should be the amount due by the terms of the obligation, $890,000, with interest thereon. (Cal. Civ. Code § 3302).

## IV.

## CONCLUSION

At the conclusion of the trial, the Jury should return a special verdict awarding Fleming damages in the amount of $890,000.

RESPECTFULLY SUBMITTED THIS 6th day of December, 2010.

Respectfully submitted,

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: /s/ Steven F. Schossberger
Attorneys for Plaintiff
Email: sschossberger@hawleytroxell.com

- 10 -

PLAINTIFF'S TRIAL BRIEF

3:08 CV 355 WQH-NLS

44015.0001.2156035.1