John D. Klinedinst, Bar No. 86254
Gregor A. Hensrude, Bar No. 226660
Daniel S. Agle, Bar No. 251090
Samuel B. Strohbehn, Bar No. 257697
KLINEDINST PC
501 West Broadway, Suite 600
San Diego, California  92101
(619) 239-8131/FAX (619) 238-8707
ghensrude@klinedinstlaw.com

Attorneys for Defendant/Counterclaimant
TOM COVERSTONE

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOYT A. FLEMING,<br><br>Plaintiff,<br><br>v.<br><br>TOM COVERSTONE,<br><br>Defendant. | Case No.    3:08-cv-00355 WQH-NLS<br><br>**DEFENDANT TOM COVERSTONE'S TRIAL BRIEF**<br><br>Courtroom:        4<br>Judge:            William Q. Hayes<br>Magistrate Judge:  Nita L. Stormes<br>Complaint Filed:  February 22, 2008<br>Trial Date:       January 25, 2011 |

## I.    INTRODUCTION

This case arises out of Hoyt Fleming's attempts to enforce an e-mail exchange on a smart phone as though it were sufficient to transfer a patent family, involving multiple persons' rights, and compel a million dollar payment.  There is a reason why this case is unique—because nobody actually thinks e-mail exchanges lacking in necessary terms and omitting critical components are binding contracts, especially for $1,000,000.  The same is even true for Hoyt Fleming—he admitted that the agreement was actually for a $10,000 deposit as consideration for him taking his patent family off the market.  If the patent family checked out after the due diligence time period, then formal agreements, deemed "necessary" to the transaction, would be drawn up.  In the one part of the e-mail agreement that was ultimately documented, Fleming's representation of Coverstone as his attorney, Fleming admitted that it was not until the attorney-client fee agreement was

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA  92101

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA  92101

signed that there was an agreement on services.  In light of the facts, the parties' documented states of mind at the time of the transaction, and their conduct, the jury will not believe the e-mail exchange to be a binding contract.

But that is not the travesty of this case.  The problem is that Hoyt Fleming kept the patent family, going so far as to assert it against two manufacturers in Idaho, and himself asserts that it currently has a "fair market value" in excess of the contract price and that he stands to gain "greatly in excess of a million dollars" by asserting it.  So there is, by his own admission, no damage.  That testimony will be the subject of a non-suit by Defendant, for there is no other testimony suggesting his valuation is inaccurate.

## II.    STATEMENT OF FACTS

Hoyt Fleming tried for years to sell his patent portfolio, a number of patents and re-issues covering GPS-enabled radar detectors.  At every turn he met rejection, and only received one offer in a dozen tries.  That offer, for $250,000, he refused as too low.

But it turns out Hoyt Fleming was best friends with Michael Dowler, an attorney who happened to represent Tom Coverstone on unrelated patent matters.  When Dowler found out that his friend Fleming was trying to sell the patent for a million dollars, Dowler told Fleming he "thought [he] could get [him] what [he] wanted" and noted that he loved "watching his friends get rich."  When he said this he had no idea if Coverstone would be interested, but was comfortable enough making those commitments anyway.

Michael Dowler then introduced Tom Coverstone and Plaintiff Hoyt Fleming via e-mail in 2007, telling Coverstone that he had checked out the patent family and it was one of the best he had ever seen.  Subsequent to that introduction, Coverstone and Fleming had an in-person meeting regarding the possibility of Coverstone purchasing Fleming's patent portfolio.  In these discussions, Fleming mentioned that his patent portfolio was so valuable because it "blocked" Escort and Uniden (the two largest manufacturers of radar detectors) from the GPS-enabled radar detector space.  In

/ / /

particular, Fleming indicated that both companies had patents rejected based upon his

patents.

On January 22, 2008, these discussions included an e-mail from Fleming:

> Tom,
>
> This email confirms that I have agreed to sell and that you have agreed to purchase U.S. Patent NO. 6,204,798, which has been reissued, Reissue Patent No. 038,038, Patent Application NO. U.S. 11/196,841, and Patent Application No. 11924,352.  The purchase price for the above patents and applications is one million dollars.
>
> You and I will strive to close the sale by February 1, 2008.  However, you and I will close the sale by February 15, 2008.
>
> Both you and I understand that I will assign a 10% interest in the above patents and applications to Vineyard Boise a church in Boise, Idaho, and that Vineyard Boise will then assign its 10% interest to you, or an entity that you designate.  I will assign my 90% interest directly to you or an entity that you designate.  You will then immediately pay me $900,000 and you will then immediately pay Vineyard Boise $100,000.
>
> You and I agree that you and/or your attorneys will draft the necessary agreements.
>
> You agree to wire me ten thousand dollars tomorrow as a deposit on the purchase price.  This deposit will not be refunded if the above sale is not completed by February 15, 2008.  I agree to work with you and your attorneys to close the sale by February 15, 2008.
>
> If you desire my assistance on matters related to the above patents and/or applications, you may retain me through my firm, Park, Vaughan, and Fleming.  My hourly rate is $425 for non-testifying services, and $850 for testifying services.
>
> If you agree to the above, then please confirm via email.
>
> Thank you.
>
> Hoyt Fleming

Coverstone replied on his Blackberry that he agreed with that statement, with a caveat or two.  Fleming alleges that the e-mail exchange was a legally binding contract, which forms the basis for the only cause of action remaining in this case (breach of contract).  When asked which part of the e-mail was an offer, Fleming started by contending that the entirety was the offer and Coverstone's responsive e-mail was an acceptance.  Upon

**DEFENDANT TOM COVERSTONE'S TRIAL BRIEF**
3:08-cv-00355-WQH-NLS

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA  92101

consideration of what that would mean as it related to him becoming Coverstone's attorney (see the last substantive paragraph), he then recanted and testified that the attorney-client paragraph was *not* included in the contract, and that a separate agreement had to be drawn up to make that an attorney-client relationship binding.  As to everything else, he contended it was a binding contract.  The duplicity will not be lost on the jurors.

In another issue presented, while the contract also calls for performance by Vineyard Boise, Fleming subsequently told Coverstone that in fact Vineyard Boise was *not* bound by the contract (in order to avoid Fleming needing to pay income tax).  In Fleming's view, in order to avoid the "assignment of income" doctrine which would make the proceeds taxable, Vineyard Boise had no obligation to transfer their 10%, reasoning that Coverstone then would not have to pay them until they did transfer it, if ever.[1]  And in fact Vineyard Boise never agreed to it nor did they even know about it at the time the e-mail exchange took place.

The same is true of Teresa Fleming—while Coverstone's response indicates that Teresa Fleming must agree to sign the transfer, Fleming never asked her if she would, and she never agreed to do so.  Because she owned a community property interest in the portfolio, her signature was a critical component for Coverstone to make sure his ownership of the patents would not be contested later.

Coverstone conducts due diligence

Consistent with the fact that their agreement was an option agreement, Coverstone undertook to conduct due diligence on the patent family immediately following the January 22, 2008 e-mail exchange.  Fleming participated in dozens of subsequent e-mail exchanges and telephone calls about the due diligence, providing information and analysis, and never once asked why Coverstone was doing the due diligence then.  As one part of the due diligence, Coverstone investigated the claims that Uniden was "blocked" from the space by Fleming.  Fleming continued to insist in e-mails that the

---

[1]     In response to Coverstone's discomfort about participating in an illegal tax scheme, Fleming offered for Coverstone to pay him the price plus the hoped-for tax savings ($1,025,000) and cut Vineyard Boise out of the deal.  Coverstone declined.

- 4 -

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

1  representation was true even when faced with clear evidence that it was not (e.g.,

2  "Strange.  I still recall that Uniden had to revise their claims to overcome my patent") but

3  ultimately admitted that his statement was wrong:

> I searched for other Uniden patents with the same inventor
> yesterday.  However, no other patents were located.  I must
> have mentally merged the Escort patent and the Uniden
> patent.  Thus, it looks like only the Escort patent was rejected
> based upon my patent.

7  This was a significant revelation that removed at least a third of the value of the patent.

8  When Coverstone learned of this, as it combined with a number of other problems that

9  had been illuminated during due diligence (from Fleming having difficulties proving

10  ownership to possible inequitable conduct in procuring the re-issue), Coverstone decided

11  not to proceed with the transaction.  He offered Fleming less money to go forward, and

12  Fleming refused.  Consequently, the transaction did not proceed to purchase.

13       From February 2008, when the transaction was called off, to the present Fleming

14  has not made *any* effort to sell the patent portfolio.  Literally none.  Instead, he has

15  engaged on a plan to monetize the patent by suing for infringement, though he refuses to

16  disclose the "plan" on the basis of attorney-client privilege.[2]  There is no doubt that he

17  has sued Escort, one of the three major manufacturers, in the District of Idaho, for

18  infringement of his patent.  That case is currently pending, and Fleming estimates the

19  damages he should receive from them to be "greatly in excess of a million dollars."  He

20  believes the "fair market value" for his patent portfolio is more than the $1 million dollar

21  sale price he offered to Coverstone in 2008.

22  / / /

23  **III.    LIABILITY**

24

25  [2]       He has not sued any other manufacturers despite his stated belief of how easily
enforceable his patents are and how many other manufacturers are infringing the patents.

26  If he is to be believed, he hasn't bothered to investigate a single product, not even from
such large targets as Lexus and Mercedes-Benz that he believes might infringe.  Fleming

27  hasn't even contacted a previously interested party who requested that he contact them if
his negotiations with Coverstone did not result in a sale.  His stated reasoning for this

28  utter failure to mitigate? The "litigation strategy" devised from the advice of his
attorneys.

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA  92101

There is no legally binding contract for a number of reasons, but to the extent the e-mail exchange is legally binding it is an option agreement.  Whether it is an option agreement or a purchase and sale agreement, there is no question that it was procured by an admitted misrepresentation.

First, the reasons why the contract itself, in whatever form, is not legally binding:

- The agreement was missing key terms, like the fact that the potential assignment would include assignment of past damages, a critical issue in patent sales like this one;

- Vineyard Boise never agreed to be bound to transfer their interest in the patent family, and in fact Fleming admitted that they were *not* bound to convey their 10% interest to Coverstone;

- Teresa Fleming never agreed to transfer her interest in the patent, though the contract expressly required her to do so;

- The agreement was never intended to be binding until documented in the "necessary agreements."  Fleming cannot articulate any agreement that would be necessary to close other than the assignment, demonstrating that the parties contemplated at least one other agreement would be entered into (which Coverstone will testify was the purchase and sale agreement);

- While Fleming contends at one point that the entire e-mail is the "offer" and the reply the "acceptance" he later alleges that the offer does not include the offer to be Coverstone's attorney, as that required subsequent documentation.  Of course, the attorney representation term is just as complete as the purchase term, so the jury can analyze this testimony for themselves.

Even if the jury were to find that the agreement was a binding one, it was for an option agreement:

- The contract itself indicates that the $10,000 is non-refundable in the event the sale does not go forward.  If it were a sale, and not an option, this provision would be meaningless;

- Fleming admitted that the $10,000 deposit was not part of the purchase price, but "consideration for him taking the patents off the market" while Coverstone did due diligence;

- There are at least 3 documents, including an e-mail with his attorney and notes taken during conversations with Fleming, where Coverstone calls the agreement an option agreement.  All of these are contemporaneous with the transaction.

- The parties agree to use documents from an earlier transaction Coverstone had done with Dowler's firm, and that transaction (and the documents reflecting it), was an option agreement.

- All patent purchases are option agreements; the purchaser pays some amount to lock up the patents so that they are justified in spending the time and money on

**DEFENDANT TOM COVERSTONE'S TRIAL BRIEF**
3:08-cv-00355-WQH-NLS

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

1  due diligence, and if that due diligence is justified the sale goes forward.

2       Last, regardless of whether the e-mail was an option or a binding purchase and

3  sale agreement, it was procured by a misrepresentation about his patent family blocking

4  Uniden from the GPS-enabled radar detector space,[3] which Hoyt Fleming later admitted

5  (after being pressed) to being wrong:

6       • "I searched for other Uniden patents with the same inventor yesterday.
   However, no other patents were located.  I must have mentally merged the Escort patent
7  and the Uniden patent.  Thus, it looks like only the Escort patent was rejected based upon
   my patent."

8

9       As is apparent simply from the number of reasons the contract was deficient from

10  a legal standpoint, it was not intended to be a contract.  Never did the parties agree that

11  this e-mail would be the stated terms of their agreement if nothing else was going to be

12  used.  So they just exchanged e-mails about what the agreement would look like when

13  completed.

14       Because there was never a binding agreement, Coverstone cannot be liable for its

15  alleged breach.

16  **IV.   DAMAGES**

17       As noted above, Fleming has admitted that he has not suffered damage.  To make

18  matters worse, he has furthered his attempts at double recovery by refusing to sell the

19  patent to anyone, even though he admitted there were channels and opportunities to do

20  so.

21  **A.   Plaintiff, by his own admission, has not suffered any damage**

22       Fleming's action fails as a matter of law because he cannot establish a necessary

23  element of his claim: damages.  *Wall Street Network, Ltd. v. New York Times Co.*, 164

24  Cal.App.4th 1171, 1178 (Cal. App. 2d Dist. 2008) (damages are a necessary element for a

25  colorable cause of action for breach of contract).  In California, where a purchaser

26  breaches and the seller elects to treat a contract as ended and the property as his own, as

---

[3]     If the jury does not believe Fleming had intent, then the misrepresentation was a
mutual mistake both individuals were operating under at the time Coverstone decided not
to go forward.

**DEFENDANT TOM COVERSTONE'S TRIAL BRIEF**
**3-08-cv-00355-WQH-NLS**

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

1   is the case in this action, the measure of the seller's damages is the difference between

2   the agreed price and the value of the property. *Western Helicopter Operations, Inc. v.*

3   *Nelson*, 118 Cal.App.2d 359, 368 (Cal. App. 1953); *Smith v. Mady*, 146 Cal.App.3d 129,

4   131 (Cal. App. 2d Dist. 1983); RESTATEMENT (SECOND) OF CONTRACTS § 347

5   (1981).  In this case, Fleming has retained the patents as his own and sued to recover the

6   alleged contract price of $890,000.00.  His damages are thus measured to be the contract

7   price minus the value of the patents.  But Fleming has admitted that the fair market value

8   of his patents is "greatly in excess of a million dollars."  Accordingly, he has not been

9   damaged.

10          California precedent supports this result.  *Smith v. Mady*, 146 Cal. App. 3d 129,

11   131 (Cal. App. 2d Dist. 1983); *Spurgeon v. Drumheller*, 174 Cal.App.3d 659, 664 (Cal.

12   App. 4th Dist. 1985); *Allen v. Enomoto* (1964) 228 Cal.App.2d 798, 803.    In *Smith v.*

13   *Mady*, as here, the plaintiff agreed to sell a piece of property to the defendant for

14   $205,000.  *Smith v. Mady, supra*, 146 Cal.App.3d at 130.  When the defendant defaulted,

15   the plaintiff then subsequently sold the property for $215,000.  *Id.*  Plaintiff then sued the

16   defendant for breach of contract, seeking the contract price.  The court held that the

17   plaintiff had not suffered any 'benefit-of-the-bargain' damages because the purchase

18   price in the subsequent sale was in excess of the contract price of the earlier sale. *Id.* at

19   131. ("Sellers argue that the damages awarded only place them in the same position they

20   would have been in had the defendants performed the contract, but a sufficient response

21   is that had defendants performed plaintiffs would be in a worse position").  Furthermore,

22   the court held that the incidental damages ($2,648.34) incurred by the plaintiff in the time

23   between the repudiation of the first agreement and the execution of the second agreement

24   were also not recoverable because the increased sales price ($15,000) covered such

25   damages as well. *Id.*

26          Accordingly, Fleming's cause of action for breach of contract fails as a matter of

27   law because he did not suffer benefit-of-the-bargain damages by virtue of Coverstone's

28   alleged breach.  *Wall Street Network, Ltd. v. New York Times Co., supra*, 164

- 8 -

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101

Cal.App.4th 1171, 1178 (Cal. App. 2d Dist. 2008) (holding that damages to the plaintiff are a necessary element for a colorable cause of action for breach of contract). And any other incidental damages Fleming has sustained as a result of the sale not going through (i.e., the $3,200.00 in patent office filing fees) are also more than set off by the "greatly" increased price and potential for enforcement royalties, leaving him with absolutely no damages. *Smith v. Mady, supra*, 146 Cal.App.3d 129, 131 (Cal. App. 2d Dist. 1983); *Spurgeon v. Drumheller*, supra, 174 Cal.App.3d 659, 664 (Cal. App. 4th Dist. 1985).

And this result makes sense, as the entire design of contract damages is to make the injured party whole. *See, e.g., Postal Instant Press v. Sealy* (1996) 43 Cal.App.4th 1704, 1708-09. Here, Fleming retained possession of the patent, which was worth more than the contract price, and proceeded to continue with his patent prosecution and licensing activities as though there never had been a "contract." He does not seek enforcement of the contract. And he admits that as part of his "litigation strategy," he has sued Coverstone and chosen to refrain from suing all but one of the countless manufacturers of infringing products, or even investigate such massive targets as Lexus, Cobra, or Mercedes-Benz, all three of which he has reason to believe infringe his patent family. Fleming did not even take the simple step of contacting a party who previously expressed interest in purchasing his patents, even though that person told Fleming to call him if the negotiations with Coverstone ever broke down. Money from Coverstone would not make him whole; it would be a windfall. Cal. Civ. Code § 3358 ("no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides.")

**B.**    **Plaintiff has taken absolutely zero steps to mitigate, even though he has been aware of such opportunities**

Fleming had made close to a dozen failed attempts to sell his patent prior to the transaction with Coverstone, all of which failed. The only entity that even made an offer suggested $250,000 as a fair price. Fleming was aware of the many ways to sell a patent, including using an auction service, and tried to use all of them before meeting

- 9 -

Coverstone.

But after the deal fell apart, *Fleming made no attempts whatsoever to sell the patent*. He did not list it on an auction service, call the broker who he had been working with, approach any of the companies he had approached before, or even call the one person who had made an offer and told him if he changed his mind and wanted to negotiate he should call him back. This is despite his representation that its "fair market value" was in excess of one million dollars. The reason he refused to mitigate, of course, is because he decided he could make more money asserting the patent than he could selling it. And if the jury believes Fleming that its value is in excess of $1 million, then he was not damaged.

### V.    CONCLUSION

This is an action that never should have been brought, but oftentimes trials are the only remedy for such lawsuits. Here, not only is the "contract" missing at least a half-dozen key terms, and was never intended to be binding, but Fleming has not been damaged by the alleged breach. Therefore, there is only one reasonable result the jury will be able to reach: a defense verdict.

KLINEDINST PC

DATED: December 6, 2010          By:  **/s/ Gregor A. Hensrude**
                                         Gregor A. Hensrude
                                         Attorneys for Defendant/Counterclaimant
                                         TOM COVERSTONE

1079564v1

KLINEDINST PC
501 WEST BROADWAY, STE. 600
SAN DIEGO, CALIFORNIA 92101